**SOUTHERN PACIFIC TRANS-PORTATION COMPANY,**
Plaintiff–Appellant,

v.

**PUBLIC UTILITY COMMISSION OF the STATE OF OREGON, and its members, Defendants–Appellees.**

No. 91–35105.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 7, 1992.

Withdrawn from Submission Oct. 16, 1992.

Resubmitted Sept. 22, 1993.

Decided Nov. 15, 1993.

James H. Clarke, Lane, Powell, Spears, Lubersky, Portland, OR, for plaintiff-appellant.

Michael T. Weirich, Asst. Atty. Gen., Salem, OR, for defendant-appellee.

Before: D.W. NELSON and REINHARDT, Circuit Judges, and CALLISTER, District Judge *.

* The Honorable Marion J. Callister, Senior United States District Judge for the District of Idaho, sitting by designation.

D.W. NELSON, Circuit Judge:

This case concerns an Oregon law which permits local authorities to ban the sounding of locomotive whistles under certain conditions. Southern Pacific Transportation Company ("Southern Pacific"), a California-based railroad which operates freight trains in Oregon and many other states, contends that the state law is preempted by three federal statutes.

Southern Pacific moved for summary judgment on preemption grounds. Oregon then filed a cross-motion for summary judgment, claiming that its regulations were not preempted as a matter of law.[1] Southern Pacific appealed the magistrate's partial grant of summary judgment in favor of the appellees.[2] We deferred submission of this case pending the Supreme Court's decision in *CSX Transp., Inc. v. Easterwood*, —— U.S. ——, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). We now affirm.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

On January 19, 1990, Southern Pacific brought an action in federal court seeking to enjoin the enforcement of Oregon Revised Statute § 763.035, Public Utility Commission Rule 860–42–330, and Public Utility Commission Order No. 89–1037. Southern Pacific claimed that these regulations were preempted by three federal laws: the Locomotive Boiler Inspection Act ("LBIA"), 45 U.S.C. § 22, *et seq.*, the Noise Control Act ("NCA"), 42 U.S.C. § 4901, *et seq.*, and the Federal Railroad Safety Act ("FRSA"), 45 U.S.C. § 421, *et seq.* The appellees—the Public Utility Commission ("Commission"), its members, and the Attorney General of Oregon—contend that the state laws and regulations are not preempted.

1. Oregon also claimed that Southern Pacific's claims against it under the Commerce Clause were invalid; the magistrate denied summary judgment on this ground. This claim was subsequently dismissed. Thus, this issue is not raised in this appeal.

2. Under 28 U.S.C. § 636, the parties may consent to trial by magistrate and then may appeal

The Oregon statute, which became law in 1983, provides the following:

(1) The power to fix and regulate the speed of railway trains and to regulate the sounding of railway train warning devices at public railroad-highway crossings is vested exclusively in the state.

(2) Upon petition ... the [Public Utility] Commission shall ... enter an order fixing and regulating the speed of railway trains or regulating the sounding of railway train warning devices.

Or.Rev.Stat. § 763.035 (1991). The Commission interpreted the statute as authorizing it to restrict the sounding of train whistles[3] "because it is a severe annoyance."

Subsequently, the Commission promulgated a rule which stated that: (1) trains were not required to sound whistles at grade crossings "equipped with operating automatic gates, flashing lights, and audible protective devices"; (2) the Commission was empowered to prohibit whistle sounding at such crossings; and (3) railroads were to provide written notification of such prohibitions to their employees. In 1988, the City of Eugene, Oregon petitioned the Commission to prohibit whistle sounding by Southern Pacific trains. The Commission then issued the Eugene Order (No. 89–1037), which banned train whistles at certain crossings in the city between 10 p.m. and 6 a.m.

## II. *MOOTNESS CLAIM*

On September 13, 1991, the Commission issued Order No. 91–1164, which rescinded the Eugene order upon finding that the "[p]rohibition of routine train whistles at protected crossings in Eugene during nighttime hours will significantly increase the risk of accidents at those crossings." Southern Pacific contends that the Commission's rescis-

the magistrate's judgment directly to this court. The parties here followed this route.

3. Although trains no longer use actual whistles, we use the term "whistle" to refer to locomotive air horns and audible warning devices.

sion of the Eugene order renders this litigation moot. It urges us either to vacate the magistrate's judgment or remand the case with instructions to consider a motion by Southern Pacific to deny the judgment preclusive effect.

■ Mootness is a threshold jurisdictional issue. *Sea–Land Serv., Inc. v. ILWU,* 939 F.2d 866, 870 (9th Cir.1991). A case becomes moot when "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). However, "[w]here one of the several issues presented becomes moot, the remaining live issues supply the constitutional requirements of a case or controversy" regardless of whether the remaining claims are "secondary." *Id.* at 497, 499, 89 S.Ct. at 1951–52; *see also Sea–Land,* 939 F.2d at 870–71 (employer's claim for injunctive relief against enforcement of arbitration awards not moot with regards to all of awards when dispute with regard to some became moot).

■ Although Southern Pacific sought declaratory and injunctive relief regarding the Eugene order, it also sought to prevent the Commission's enactment of future orders under the statute. Rescission of the Eugene order does not prevent the Commission from enacting further whistle restrictions or enforcing other existing restrictions. Whistle prohibition orders are in effect in other Oregon cities and the Commission has stipulated that it will continue to make such orders. Thus, the controversy regarding the legality of the statute and Commission rule is as "live" now as it was when Southern Pacific first sought relief. Moreover, although the claim regarding the Eugene order is moot, we may address the remaining, live claims. *McCormack,* 395 U.S. at 497, 89 S.Ct. at 1951.

### III. *PREEMPTION ANALYSIS*

■ Article VI of the Constitution provides that the laws of the United States shall be the supreme law of the land; as such, any state law that conflicts with federal law is "without effect." *See Cipollone v. Liggett*

*Group Inc.,* —— U.S. ——, ——, 112 S.Ct. 2608, 2611, 120 L.Ed.2d 407 (1992), (citing *M'Culloch v. Maryland,* 4 Wheat. 316, 427, 4 L.Ed. 579 (1819)). In evaluating a federal law's preemptive effect, however, we proceed from the presumption that the historic police powers of the state are not to be superseded by a federal act "unless that [is] the clear and manifest purpose of Congress." *Id.* at ——, 112 S.Ct. at 2617, (citing *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)).

Applying this framework, the Supreme Court has identified three circumstances in which state law is preempted by federal law: 1) where Congress explicitly defines the extent to which its enactments preempt state law ("express preemption"); 2) where state law regulates conduct in a field that Congress intended the federal government to exclusively occupy ("field preemption"); and 3) where it is impossible to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress ("conflict preemption"). *English v. General Electric Co.,* 496 U.S. 72, 78–80, 110 S.Ct. 2270, 2274–75, 110 L.Ed.2d 65 (1990) (citations omitted). Although these categories are not "rigidly distinct," *id.* at 79, 110 S.Ct. at 2275, they provide a useful framework for analyzing preemption questions like those presented by the case at bar. We proceed to consider whether or not the LBIA, NCA, and FRSA preempt the state statute and regulations.

### A. *Locomotive Boiler Inspection Act*

■ The Locomotive Boiler Inspection Act ("LBIA"), 45 U.S.C. § 22 *et seq.,* grants the United States the power to regulate all "parts and appurtenances" of railroad locomotives. The parties agree that the locomotive whistles regulated by the Oregon law are "parts or appurtenances" of locomotives as that phrase is used in the LBIA. The question of whether Congress intended the LBIA to preempt state regulation of railroad parts and appurtenances was addressed by the Supreme Court in *Napier v. Atl. Coast Line R.R. Co.,* 272 U.S. 605, 47 S.Ct. 207, 71 L.Ed. 432 (1926), which held that the Act was in-

tended to "occupy the field," *id.* at 613, 47 S.Ct. at 210.

In a recent decision involving the question of whether a certain state regulation fell within a preempted field, the Supreme Court noted that the preempted field is "defined by reference to the purpose of the state law in question," and that for "a state law to fall within the preempted zone, it must have some direct and substantial effect" on the regulated field. *English,* 496 U.S. at 84–85, 110 S.Ct. at 2278; *see also, Gade v. Nat'l Solid Wastes Management Ass'n,* —— U.S. ——, ——–——, 112 S.Ct. 2374, 2378–79, 120 L.Ed.2d 73 (1992) (a state law that "directly, substantially, and specifically regulates" occupational safety is within the preempted field).

At issue in *Napier* were state regulations prohibiting trains without cab curtains and fire-box doors from operating within the state. Although Congress had not promulgated regulations with regard to either device, the Court held that states were not free to do so themselves. *See Napier,* 272 U.S. at 609, 613, 47 S.Ct. at 208–10. The Court found that the power delegated by the LBIA was a "general one" which extended to the "design, the construction and the material of every part of the locomotive and tender and of all appurtenances." *Id.* at 611, 47 S.Ct. at 209. The Court rejected the argument that because the state regulations were intended to address a safety concern not addressed by existing federal regulations, the two regimes did not conflict. *Id.* at 612, 47 S.Ct. at 209. As the Court concluded, state regulations regarding the equipment of locomotives are preempted "regardless of however commendable or different their purpose." *Id.* at 613, 47 S.Ct. at 210.

The LBIA creates a uniform national inspection and regulation scheme for locomotive equipment. The advantage of such a scheme is self-evident: locomotive companies need only concern themselves with one set of equipment regulations and need not be prepared to remove or add equipment as they travel from state to state. The Supreme Court's decision in *Napier* describes the LBIA as regulating the "design, the construction and the material" of every part of

the locomotive, but does not mention the *use* of locomotive parts. Because the Oregon law neither limits nor expands the type of equipment with which locomotives are required to be equipped, it neither interferes with the goals of the LBIA nor substantially interferes with its implementation.

### B. *Noise Control Act*

■ The federal Noise Control Act ("NCA") of 1972, 42 U.S.C. § 4901–18, directs the Environmental Protection Agency ("EPA") to establish standards for railroad noise emissions. *Id.* § 4916(a). Under a provision labeled "state and local standards and controls," the Noise Control Act sets forth two provisions pertaining to the NCA's preemption of state laws.

> [A]fter the effective date of a regulation under this section applicable to noise emissions resulting from the operation of any equipment or facility of a surface carrier engaged in interstate commerce by railroad, *no State ... may adopt or enforce any standard applicable to noise emissions* resulting from the operation of the same equipment ... of such carrier unless such standard is identical to a standard ... prescribed by any regulation under this section.

*Id.* § 4916(c)(1) (emphasis added). In addition,

> [n]othing in this section shall diminish or enhance the rights of any State ... to establish ... controls on levels of environmental noise ... if the Administrator ... determines that such ... control ... is necessitated by special local conditions and is not in conflict with regulations promulgated under this section.

*Id.* § 4916(c)(2).

As the above language makes clear, state laws relating to noise emissions are preempted by the NCA only when a regulation has been enacted pursuant to the Act that covers the same carrier equipment. Here, there is no preemption because, in implementing § 4916, the EPA has not enacted any regulation covering locomotive whistles. Indeed, the EPA expressly has *exempted* locomotive whistle standards from its regulatory

scheme, and expressly has invited such regulation by the individual states.[4] 49 C.F.R. § 210.3(b)(3) (1992). We therefore hold that the NCA does not preempt Oregon's law and regulations regarding train whistle sounding.

## C. Federal Railroad Safety Act

The FRSA was enacted in 1970 to reduce railroad-related accidents and deaths and to improve rail safety more generally. 45 U.S.C. § 421, et seq.; see also Easterwood, — U.S. at —, 113 S.Ct. at 1736. The Act empowers the Secretary of Transportation, through the Federal Railroad Administration, to promulgate such regulations as necessary to improve safety. The preemptive effect of these regulations on state laws is governed by § 434 of the Act, which reads:

> The Congress declares that laws, rules, regulations, orders and standards relating to railroad safety shall be nationally uniform to the extent practicable. *A State may adopt or continue in force any law, rule, regulation, order or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order or standard covering the subject matter of such State requirement.* A State may adopt or continue in force an additional or more stringent law, rule, regulation, order or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.

45 U.S.C. § 434 (emphasis added).

■ "According to § 434, applicable federal regulations may preempt any state 'law,

rule, regulation, order, or standard relating to railroad safety.'" *Easterwood*, — U.S. at —, 113 S.Ct. at 1737. This case presents the question of whether the FRSA and its accompanying regulations cover the same subject matter as the Oregon statute and regulations. *Id.* at —, 113 S.Ct. at 1738; *Marshall v. Burlington N., Inc.*, 720 F.2d 1149, 1153 (9th Cir.1983). As the Supreme Court has stated recently, this is not an easy standard to meet: To prevail on the claim that the regulations have preemptive effect, petitioner must establish more than that they 'touch upon' or 'relate to' that subject matter, for 'covering' is a more restrictive term which indicates that *preemption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law.* The term 'covering' is in turn employed within a provision that displays considerable solicitude for state law in that its express preemption clause is both prefaced and succeeded by express saving clauses. *Easterwood*, — U.S. at —, 113 S.Ct. at 1738 (citations omitted) (emphasis added).

■ Southern Pacific contends that the Oregon statute regulates the same "subject matter" as covered by FRA § 229, which requires every lead locomotive to be equipped with an audible warning device capable of producing a minimum level of sound 100 feet forward of the locomotive.[5] 49 C.F.R. § 229.129. We do not agree.

As an initial matter, we note that the issue is not whether the Oregon statute and regulations implicate safety concerns or noise pollution concerns. Although directed at train whistle "annoyance," the whistles are an important safety device and the Oregon regula-

---

**4.** The reason for this exception was provided by the EPA when it initially addressed the issue of railroad noise regulation:

> The EPA does recognize that a noise problem exists as to the use and extent of railroad warning devices, ... [but] believes that such regulation can best be considered and implemented by State and local authorities who are better able to evaluate the particular local circumstances with respect to the nature and extent of the noise problem and the requisite safety considerations involved. Any comprehensive Federal regulation in this area could be overly diverse and cumbersome.... Since

acoustic warning devices ... can best be regulated at the local and [s]tate level for the reasons indicated, EPA does not propose to regulate acoustic warning devices at this time.

41 Fed.Reg. 2185–2186 (1976).

**5.** Southern Pacific contends that the Oregon statute is also preempted by 45 C.F.R. § 217. Section 217 requires railroads to keep their operating rules on file with the FRA. Because the FRA neither approves nor adopts the railroad's rules in any manner, the rules do not have the force of law and therefore cannot preempt the Oregon statute. *See* 49 C.F.R. § 217.7.

tions thus clearly implicate safety concerns.[6] The issue is rather whether, as the Supreme Court put it in *Easterwood,* the federal regulation "substantially subsumes the subject matter" of the state regulations. —— U.S. at ——, 113 S.Ct. at 1738. In *Easterwood,* the Court made clear that in light of the restrictive term "cover" and the express savings clauses in the FRSA, FRSA preemption is even more disfavored than preemption generally. *See Id.* In applying its reading of the FRSA to the facts of *Easterwood,* moreover, the Court did not look at broad categories such as "railroad safety," it looked at the narrow categories of "warning devices" installed at federally-improved grade crossings and "train speed." *Id.* at ——, 113 S.Ct. at 1738–43. Applying a comparable level of specificity in our analysis, we conclude that FRA § 229 does not preempt the Oregon regulations because the "subject matter" of § 229 is the sound-producing *capacity* of train whistles, a subject matter which does not substantially subsume the restrictions on *use* of whistles embodied in the Oregon regulations.

FRA § 229 requires that all railroad whistles have a specified minimum sound capacity. The Oregon statute and regulations, by contrast, regulated only certain uses of railroad whistles. The distinction between whistle capacity and whistle use, of course, may not always be dispositive. A total ban on the use of locomotive whistles in Oregon, for example, arguably would defeat the purpose of the whistle capacity provisions of § 229, and likely would be found to conflict with the subject matter of the FRA regulation. The Oregon statute and regulations, however, did not reach nearly this far. The state regulations restricted the blowing of whistles only at grade crossings equipped with "operating gates, flashing lights, and audible protective devices," and the restrictions were only in effect from 10 p.m. to 6 a.m. The Oregon restrictions thus fall within the scope of the savings clause incorporated into the FRSA preemption provision.

In sum, the comparatively minor use restriction embodied in the Oregon regulations cannot be said to be covered by the sound capacity specifications set forth in FRA § 229, and the Oregon statute and regulations thus are not preempted by the FRSA.

### IV. CONCLUSION

We find that the question of whether Oregon's statute and regulations regarding train whistle sounding were preempted by federal law was properly before this court; it was not moot. Because the LBIA, NCA, and FRSA do not preempt Oregon's statute and regulations, the magistrate properly granted partial summary judgment in favor of Oregon.

AFFIRMED.

---

**6.** While it is true that the state did not promulgate the regulations at issue for the purpose of furthering safety, there is no doubt that the regulations impact railroad safety. In its ruling rescinding the Eugene Order on the basis of safety concerns, the Commission admitted as much.