[No. 70884-3.   En Banc.]
Argued November 8, 2001.    Decided March 7, 2002.

THE CITY OF SEATTLE, *Petitioner*, v. BURLINGTON NORTHERN RAILROAD COMPANY, *Respondent*.

*Thomas A. Carr, City Attorney,* and *Maureen Madion, Assistant,* for petitioner.

*Daniel L. Kinerk* and *Sarah E. Hall* (of *Kroschel Gibson Kinerk & Reeve, L.L.P.*) and *Michael B. King* (of *Lane Powell Spears Lubersky, L.L.P.*), for respondent.

*Marilee C. Erickson* on behalf of Association of American Railroads, amicus curiae.

IRELAND, J. — This court granted review of a Court of Appeals' decision reversing a Seattle Municipal Court finding that Burlington Northern Railroad Company violated Seattle Municipal Code (SMC) ordinances regulating railroad switching and blocking on city streets. The Court of Appeals' decision is affirmed because the Interstate Commerce Commission Termination Act of 1995 (ICCTA) and the Federal Rail Safety Act of 1970 (FRSA) unambiguously express a clear congressional intent to regulate railroad operations as a matter of federal law. Both federal acts preempt the City's railroad switching and blocking ordinances, SMC 11.66.080 and 11.66.100.

## FACTS

Since 1903, the Burlington Northern Railroad Company has operated its railroad through the City of Seattle under a franchise ordinance. Ordinance No. 9119 (franchise ordinance) grants to Burlington "the right, privilege and authority to lay down, construct, maintain and operate . . . tracks" within the city. Seattle City Ordinance No. 9119

at 1 (1903); Clerk's Papers (CP) at 73. Section 3 First of the franchise ordinance also reserves the City's right:

> to regulate the speed of locomotives and trains within the limits of the rights of way herein granted, and the maximum period of time for which locomotives, cars or trains shall be allowed to blockade travel along or across the streets embraced in this grant, or intersecting streets, and shall have such further control and police powers over such right of way as the City Charter and State laws permit.

Seattle City Ordinance No. 9119 § 3 First at 5 (1903); CP at 93.

In 1979, the City of Seattle promulgated SMC 11.66.080 and 11.66.100 (ordinances). Between May 1996 and May 1997, the City issued 19 citations to Burlington for violating the ordinances by blocking traffic for time periods in excess of four minutes. Each citation carried a penalty of $1,000.

In 1997, Burlington challenged the constitutionality of the ordinances, arguing the ordinances are void for vagueness and they violate the due process and commerce clauses of the United States Constitution. Burlington also argued the ordinances are preempted by the ICCTA and the FRSA.

Following a hearing on the merits, the municipal trial court found federal preemption did not apply because the City had exercised valid police powers reserved to itself through its franchise ordinance. On appeal, the superior court affirmed. Burlington obtained discretionary review of the superior court's decision at the Court of Appeals, which concluded federal law preempted SMC 11.66.080 and 11.66.100 and reversed the trial court.

## ISSUE

Whether a city can control switching activities on city streets of a railroad engaged in interstate and intrastate commerce.

ANALYSIS

Standard of Review

█ Whether the Interstate Commerce Commission Termination Act and the Federal Rail Safety Act of 1970 preempt local regulation of railroad activities turns on this court's interpretation of those statutes. "Construction of a statute is a question of law which is reviewed de novo." *Rettkowski v. Dep't of Ecology*, 128 Wn.2d 508, 515, 910 P.2d 462 (1996).

ICCTA

Under 49 U.S.C. § 10501(b) of the ICCTA, Congress has designated jurisdiction over railroad operations to the Surface Transportation Board (STB)[1] as follows:

(b) The jurisdiction of the Board over—

(1) . . . rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, *operation*, abandonment, or discontinuance of spur, industrial, team, *switching*, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

*is exclusive*. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b) (1994 & Supp. I 1995) (emphasis added).

█ When the ICCTA was adopted in 1996, the federal regulatory scheme for interstate railroad operations was "changed significantly." *Flynn v. Burlington N. Santa Fe Corp.*, 98 F. Supp. 2d 1186, 1188 (E.D. Wash. 2000). "The purpose of the Act was to . . . significantly reduce regulation

---

[1] "The ICCTA abolished the Interstate Commerce Commission, created the STB, and granted the board jurisdiction over certain interstate rail functions and proceedings. *See* the ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (1995)." *City of Auburn v. United States*, 154 F.3d 1025, 1028 n.3 (9th Cir. 1998).

of surface transportation industries." *Id*. (citing S. REP. No. 176, 104th Cong., 1st Sess. (1995)). The ICCTA placed with the STB " 'complete jurisdiction, to the exclusion of the states, over the regulations of railroad operations.' " *Id*. (quoting *CSX Transp., Inc. v. Ga. Pub. Serv. Comm'n*, 944 F. Supp. 1573, 1584 (N.D. Ga. 1996)).

The City argues it is entitled to local regulatory authority over railroad activities and urges this Court to distinguish economic interests from local police authority. The City argues that federal regulation over interstate railroads is exclusively for economic concerns. The City cites Congressional legislative history as authority.

The original House Report demonstrates that the ICCTA focused on *economic regulation* and was

> Intended to standardize all economic regulation (and deregulation) of rail transportation under Federal law, without the optional delegation of administrative authority to State agencies to enforce the Federal standards, as provided in the relevant provisions of the Staggers Rail Act.

Suppl. Br. of Pet'r at 12. (citing H.R. REP. No. 104-311 (*reprinted in* 1995 U.S.C.C.A.N. 793, 807)).

"[W]hile '[l]egislative history can be a legitimate guide to a statutory purpose obscured by ambiguity . . . in the absence of a clearly expressed legislative intention to the contrary, the language of the statute itself must ordinarily be regarded as conclusive.' " *City of Auburn v. United States*, 154 F.3d 1025, 1029 (9th Cir. 1998) (second alteration in original) (quoting *Burlington N. R.R. v. Okla. Tax Comm'n*, 481 U.S. 454, 461, 107 S. Ct. 1855, 95 L. Ed. 2d 404 (1987)).

Congress granted exclusive jurisdiction to the STB over "transportation by rail carriers, and the remedies provided in this part with respect to . . . *rules* (including car service, interchange, and *other operating rules), practices, routes*, services, and . . . *switching*." 49 U.S.C. § 10501(b)(1) and (2) (emphasis added).

We next compare the ICCTA to the city's ordinances under which the citations were issued.

SMC 11.66.080 provides:

No person who is responsible for the operation of any railroad train or car which is engaged in *switching* shall direct the operation of or operate the same in such a manner as to prevent or interfere with the use of any street or alley for purposes of travel, or impede property access, for a period of time longer than four (4) consecutive minutes.

SMC 11.66.080(A) (emphasis added).

SMC 11.66.100 provides:

*No switching* movement shall be made on or across any arterial streets, between the hours of seven a.m. (7:00 a.m.) to nine a.m. (9:00 a.m.) and four p.m. (4:00 p.m.) to six p.m. (6:00 p.m.), except on Sundays and public holidays.[2]

SMC 11.66.100 (emphasis added).

The ICCTA unambiguously reserves jurisdiction over railroad switching to the STB. The City's reliance on legislative history is misplaced. The City's ordinance attempts to regulate railroad switching activities. Comparing the ordinances with the ICCTA, it is clear that jurisdiction over switching activities is solely within the purview of the STB.

Federal Preemption Precedent

■ Federal preemption is required when Congress conveys an intent to preempt local law by: (1) "express preemption," where Congress explicitly defines the extent to which its enactments preempt laws; (2) "field preemption," where local law regulates conduct in an area the federal government intended to exclusively occupy; and (3) "conflict preemption," where it is impossible to comply with both local and federal law. *S. Pac. Transp. Co. v. Pub. Util. Comm'n*, 9 F.3d 807, 810 (9th Cir. 1993).

---

[2] Switching is defined in the code chapter as "the starting and stopping, coupling and uncoupling and/or moving back and forth of engines, trains, or parts of trains on, or across any street or alley." SMC 11.14.625.

■ The express language of the ICCTA indicates the STB has "exclusive" jurisdiction over rail carriers as to "switching," and "[e]xcept as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b) (1994 & Supp. I 1995). Congress explicitly designated switching activities as falling within the jurisdiction of the STB under the ICCTA; "express" federal preemption applies to the City's ordinances.

That federal preemption applies to local ordinances is supported by case law. In *CSX Transportation, Inc.*, a railroad service provider challenged the Georgia Public Service Commission's authority, first established in 1897, to regulate its activities subsequent to the enactment of the ICCTA. In holding the commission's authority was preempted, the court gave deference to the STB's finding that " 'the underlying state regulatory role no longer exists' and the 'exclusive jurisdiction of the [STB] extends to transportation between a place in a State and a place in the same state as part of the interstate rail network.' " *Id.* at 1584 (quoting STB Public Notice, Ex Parte No. 388, Apr. 3, 1996).

In *City of Auburn*, local regulation was also preempted by the ICCTA. In that case, the City of Auburn (Auburn) sought review of an STB decision finding federal preemption of local environmental review laws. Auburn objected to the reopening of an existing railroad line in Washington without requiring the railroad to comply with local environmental permitting standards. Auburn also argued the ICCTA's legislative history indicated an intent solely to preempt regulations impacting economic interests. 154 F.3d at 1027-29, 1031. In affirming the STB decision, the Ninth Circuit found that "[a]ll the cases . . . find a broad reading of Congress' preemption intent, not a narrow one." *Id.* at 1030. Additionally, the court concluded that "there is nothing in the case law that supports Auburn's argument that, through the ICCTA, Congress only intended preemption of economic regulation of the railroads." *Id.*

The City's arguments in favor of a narrow interpretation of the ICCTA are unpersuasive. The language of the ICCTA is unambiguous. Congress gave the ICCTA broad preemptive power to enable uniform regulation of interstate rail operations, which includes regulation over rail car switching activities. Seattle's ordinances 11.66.080 and 11.66.100 are preempted by the ICCTA.

FRSA

Burlington argues the City's switching and blocking ordinances are also preempted by the FRSA. The FRSA provides that "[l]aws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106. Because Burlington must speed or slow its rail operations to comply with chapter 11.66 SMC, Burlington contends the City is, essentially, regulating an area of railroad safety governed by Congress. Burlington relies on *CSX Transportation, Inc. v. City of Plymouth*, 86 F.3d 626 (6th Cir. 1996) (*Plymouth* I) and *CSX Transportation, Inc. v. City of Plymouth*, 92 F. Supp. 2d 643 (E.D. Mich. 2000) (*Plymouth* II).

In *Plymouth* I, the Sixth Circuit reviewed the validity of a municipal ordinance prohibiting obstruction of street traffic in excess of five minutes. The court found municipal regulation of speed was preempted by the FRSA. The court noted that while the FRSA does not expressly prohibit municipal regulation of matters of safety covered by federal schemes, " 'individual [local, . . . ] officials are without authority under the [FRSA] to require the Railroad to meet any safety standard beyond those provided for in the national Act.' " *Plymouth* I, 86 F.3d at 628 (alterations in original) (quoting *Donelon v. New Orleans Terminal Co.*, 474 F.2d 1108, 1113 (5th Cir. 1973)).

In *Plymouth* II, a federal district court evaluated a municipal ordinance limiting the duration of time in which railroads could block traffic at crossing grades. Finding that the ordinance was preempted by the FRSA, the court reasoned:

Under [the] preemption clause, a state regulation related to railroad safety is permissible where the Secretary has not regulated, or where the state regulation is in response to a local, rather than a national, safety concern, so long as the regulation is not in conflict with federal law and does not unduly burden interstate commerce.

*Plymouth* II, 92 F. Supp. 2d at 649. "The Act's purpose is to 'promote safety in every area of railroad operations and reduce railroad-related accidents and incidents.' " *Id.* (quoting 49 U.S.C. § 20101). Speed was found critical to federal goals for rail safety, and municipal ordinances imposing constraints on speed are necessarily preempted by the FRSA.

■■ The language of the FRSA indicates when state legislation involving rail safety is permissible:

A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation or order—

(1) is necessary to eliminate or reduce an essentially local safety hazard;

(2) is not incompatible with a law, regulation, or order of the United States Government; and

(3) does not unreasonably burden interstate commerce.

49 U.S.C. § 20106.

Because the FRSA speaks to "state" regulation, the parties raise questions as to whether there is preemption under the FRSA for local regulation, and, if so, if such local regulation is subject to the exceptions in the FRSA. Burlington relies on *Plymouth* I for its claim that Congress intended to preempt all railroad safety legislation, except certain *state* laws and that the FRSA preempts all municipal legislation related to railroad safety. We find more persuasive *Burlington Northern Railroad v. City of Connell*,

which holds that "[t]he mere fact that [the FRSA] § 434 allows *state* regulation (while remaining silent regarding *municipal* authority) does not demonstrate that *local* governments are expressly precluded from utilizing the power conferred by that section." 811 F. Supp. 1459, 1464 (E.D. Wash. 1993) (emphasis added). Thus, we find that for purposes of the FRSA, municipal regulation should be treated the same as state regulation. We next examine whether the City's ordinances meet the guidelines for regulations exempted from the FRSA.

The City asserts chapter 11.66 SMC meets the exemptions under the FRSA and is therefore a permissible exercise of local police powers. The City adds that its ordinance only "touches upon" speed, and does not have a "direct and substantial effect" on safety in conflict with FRSA objectives. The City claims the FRSA does not "substantially subsume" regulations concerning railroad switching and street blocking and therefore fails the test set forth in *Southern Pacific Transportation Co.*

In *Southern Pacific Transportation Co.*, the Ninth Circuit reconciled local police power with FRSA objectives. There, a state statute permitted the Public Utility Commission to ban the sounding of train whistles under some conditions. A Commission noise regulation banning the use of blow whistles at crossing grades was found not to fall within the "preempted zone" because the federal regulation which required audible warning devices on every lead locomotive and other federal provisions did not substantially subsume regulation of the *use* of the whistles. Therefore, Oregon's regulation did not have a " 'direct and substantial effect' " on federal regulations. The court reasoned that preemption is required when a regulation does more than " 'touch upon' or 'relate to' " an area covered by the FRSA. "[']To prevail on the claim that the regulations have preemptive effect, petitioner must establish more than that they 'touch upon' or 'relate to' that subject matter, for 'covering' is a more restrictive term which indicates that *preemption will lie only if the federal regulations substantially subsume the*

*subject matter of the relevant state law.*[']" *S. Pac. Transp. Co.*, 9 F.3d at 812 (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664, 113 S. Ct. 1732, 123 L. Ed. 2d 387 (1993)).

*CSX Transportation, Inc. v. City of Mitchell*, 105 F. Supp. 2d 949 (S.D. Ind. 1999) applied the "substantially subsumed" test to determine if local regulation of rail operation is preempted by the FRSA under facts very similar to the instant case. CSX brought an action against the City of Mitchell, Indiana, seeking declaratory and injunctive action to prevent the City's enforcement of a state statute prohibiting trains from occupying railroad crossings for more than 10 minutes. The court granted CSX's summary judgment motion, holding enforcement of the statute was preempted by the FRSA. The court found the City's enforcement of the statute frustrated the railroad's compliance with federal regulations governing train speed, train length, and trains in physical motion, as well as airbrake testing and the use of flagmen. Although none of these areas of safety was the subject of the statute's regulation, the fact that safety was affected mandated preemption by the FRSA.

An examination of chapter 11.66 SMC reveals that speed is more than "touched upon." Chapter 11.66 SMC prohibits Burlington from impeding "property access . . . for a period of time longer than four (4) consecutive minutes." SMC 11.66.080(A). In fact, Burlington is required not to operate its railroad through the city until:

> A time interval between successive switching operations shall be provided if the initial switching operation prevents or interferes with the use of the street or alley for purposes of travel or property access, in order to allow the waiting traffic to proceed, provided that the time interval between successive switching operations need not exceed two (2) consecutive minutes.

SMC 11.66.080(B). Furthermore, an ordinance also restricts switching activities to off-peak hours. *See* SMC 11.66.100.

■ The City's ordinance aims to regulate street blockage for periods in excess of four consecutive minutes, in addition to requiring the railroad to schedule two-minute intervals between blocking incidents. An ordinance also prohibits rail car switching during peak traffic hours. These ordinances impact areas of safety regulated by the FRSA because they affect the speed at which trains travel, train length, and trains in physical motion. Under these precedents, chapter 11.66 SMC does more than "touch upon" or "relate to" safety, and the FRSA preempts the City's ordinances.

Contractual Authority to Regulate Railroad Activities

Relying on *Township of Woodbridge v. Consolidated Rail Corp.*, 2000 WL 1771044 (I.C.C. [Interstate Commerce Commission]), the City contends this case is controlled by the language of Ordinance No. 9119. In *Woodbridge*, the STB gave deference to a stipulation and order of settlement entered into by Woodbridge and Consolidated Rail that required the railway to comply with a local noise ordinance. The stipulation predated enactment of the ICCTA and arose from litigation over noise caused by idling trains. When Woodbridge sought enforcement of the stipulation in 1999, the hearing court concluded the matter was outside its jurisdiction due to the broad preemption provisions of the ICCTA. Thus, Woodbridge filed an action before the STB. The STB found that regulating the noise from idling trains did not interfere with rail transportation.

■ Here, the City's claim that it is entitled to regulate based upon its franchise ordinance is not persuasive. Burlington concedes that it operates under a franchise agreement under Ordinance No. 9119, which was passed in 1903. The agreement is nonetheless an ordinance—that is, a law. Like any state law, a local ordinance is subject to Congressional preemption. Substantial authority supports the conclusion that preemption of SMC 11.66.080 and 11.66.100 is appropriate.

674

## CONCLUSION

The express language of the ICCTA imparts to the STB broad federal authority over all interstate and intrastate railroad activities and operations. The FRSA preempts local regulations that impact interstate and intrastate railroad safety. The City's ordinance that reserves to it the authority to control railroad activities that interfere with city traffic is subject to preemption under the ICCTA and the FRSA. We affirm the Court of Appeals' conclusion that SMC 11.66.080 and 11.66.100 are federally preempted.

ALEXANDER, C.J., and SMITH, JOHNSON, MADSEN, SANDERS, BRIDGE, CHAMBERS, and OWENS, JJ., concur.