**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/walareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE CITY OF SEATTLE, | No. 82377-9-I |
| Appellant/Cross-Respondent, | |
| v. | DIVISION ONE |
| BALLARD TERMINAL RAILROAD COMPANY., L.L.C. | PUBLISHED OPINION |
| Respondent/Cross-Appellant. | |

SMITH, A.C.J. — This appeal concerns the City of Seattle's efforts to construct the missing link, a 1.4-mile gap in the Ballard area of the Burke-Gilman Trail. Seattle sued the Ballard Terminal Railroad Company (BTRC) to require it to relocate a portion of its tracks to enable the trail's construction. Seattle claims BTRC is required to do so under both the 1997 operating agreement between the parties and the franchise ordinance issued by Seattle shortly thereafter, and appeals the superior court's summary judgment rulings that (1) the provision of the franchise ordinance that requires BTRC to relocate its tracks is preempted by the federal Interstate Commerce Commission Termination Act of 1995 (ICCTA), 49 U.S.C. §§ 10101-16106, and (2) the operating agreement does not require BTRC to move its tracks in the missing link area. BTRC cross-appeals, contending that the court erred by denying its claim for damages and attorney fees under Washington's anti-SLAPP[1] statute, RCW 4.25.510. Because the

---

[1] Strategic Lawsuit Against Public Participation.

franchise ordinance is a federally-preempted local regulation regarding the route and construction of a railroad, the operating agreement only required BTRC to relocate its tracks to cooperate with the construction of the trail outside the missing link area, and Seattle's suit is not the type of action addressed by the anti-SLAPP statute, we affirm on all counts.

FACTS

The Burke-Gilman Trail is a regional bicycle and pedestrian trail that runs from Golden Gardens Park in Seattle to the Sammamish River Trail in Bothell, except for the missing link at issue here—a gap between the Hiram M. Chittenden Locks (Ballard Locks) and 11th Avenue NW in the Ballard neighborhood of Seattle. Seattle opened the first portions of the Burke-Gilman Trail in 1978 on a portion of abandoned rail line it had acquired from the Burlington Northern Railroad Company. In 1988, Burlington Northern and Seattle signed a "Joint Statement of Principles" expressing their shared long-term goal to establish a "continuous and permanent linear corridor along selected railroad rights-of-way to complete the Burke-Gilman Trail and other urban trails" while also continuing to support rail-served business along these rights of way. Burlington Northern continued to abandon portions of its rail lines and Seattle continued to convert these portions into trails.

In the late 1990s, Burlington Northern announced its intent to abandon the Ballard Line, a 2.6-mile railroad line serving shippers in Ballard. In 1996, the

No. 82377-9-I/3

Seattle City Council adopted Resolution 29474,[2] endorsing a preferred plan for the development of the Burke-Gilman Trail in the area of the Ballard line, with the preferred route traveling along the railroad from 8th Avenue NW to 11th Avenue NW, leaving the tracks and continuing up 11th Avenue NW to NW Leary Way and NW Market Street, and then returning to the line west of the Ballard Locks.

Meanwhile, some of the shippers who had been served by the Ballard Line formed the Ballard Terminal Railroad Company (BTRC). BTRC entered negotiations with Seattle with the goal of preserving rail service even as Seattle pursued acquiring the corridor to develop the final portions of the Burke-Gilman Trail.

On September 14, 1997, as a result of these negotiations, BTRC and Sea Lion Railroad (SLR), a non-profit acting as Seattle's proxy, entered into the operating agreement. The operating agreement described its purpose as preserving the Ballard Line "intact for rail use, trail use, and other compatible public purposes." It explained the parties' plan for SLR to seek authorization from the Surface Transportation Board (STB) to railbank[3] the line, for SLR to transfer the underlying real estate and assign the operating agreement to Seattle, and for BTRC to then seek authorization from the STB to continue operating the railroad.

---

[2] http://clerk.seattle.gov/~archives/Resolutions/Resn_29474.pdf [https://perma.cc/NYR5-UTFJ].

[3] "Railbanking" permits an owner of a railroad to convert the line into a recreational trail while preserving the right of way for future possible reactivation of rail service. See 16 U.S.C. § 1247(d).

3

The operating agreement provided that the parties "agree that the trail . . . and railroad shall be constructed within the areas indicated in Exhibit D in all portions of the premises which are not in street right of way." Exhibit D showed a map of the planned trail and line, corresponding to the route Seattle endorsed in Resolution 29474. The portion of the premises which is in street right-of-way is the stretch between 11th Avenue NW and the Locks, which today is the missing link of the Burke-Gilman Trail.



The operating agreement also gave Seattle "the right to require [BTRC] to relocate its track in order to accommodate trail construction in accordance with this Agreement; provided, however that a continuous track on the premises shall be provided unless [BTRC] consents otherwise" and required BTRC to "promptly move its track at [Seattle's] written request to accommodate the construction of

trail facilities."  Furthermore, it provided that Seattle would "undertake[ ] to provide [BTRC] with 120 days notice, and a subsequent opportunity to consult, prior to [Seattle's] presentation of a request for initial authorization or financing for an extension of the Burke-Gilman Trail in the area between 11th Avenue [NW] and the Locks within the premises."

Shortly after the parties executed the operating agreement, Seattle passed Ordinance 118734 (franchise ordinance), which granted BTRC the right to operate the railroad along the Ballard Line for 30 years.  Section 4 of the franchise ordinance reserved for Seattle the "full and complete right of access to any space occupied by [the Ballard Line] tracks and to all of said franchise right-of-way" and the right to excavate the ground within the right-of-way "for all purposes of construction, maintenance, repair, operation and inspection of any public utilities and public improvements."  It provided that "[i]n all cases involving a possibility of such interference, or removal of lateral support or excavation beneath the tracks . . . [BTRC] shall, at its own cost and expense, remove, relocate, support, reinforce said tracks as necessary."

SLR assigned the operating agreement to Seattle in December 1998.  In 2001, Seattle adopted Resolution 30408, noting that the existing plan for the Burke-Gilman section between 11th Avenue NW and the Locks was unlikely to meet Seattle's goals of creating safe bicycle and pedestrian travel while also minimizing impacts to adjacent businesses.  The resolution directed a work team to investigate alternate routes, "including the publicly owned railbanked right of

way." Seattle eventually decided to move forward with constructing the missing link along the railroad right-of-way, and prepared an Environmental Impact Statement for this purpose.[4]

In December 2018, BTRC petitioned the STB seeking a declaratory order prohibiting Seattle from moving forward with its plan. Seattle responded that BTRC's claims were about a contract dispute over the operating agreement and should be heard by a state court. The STB stayed its decision "pending a decision from the state court resolving the City's contract action" and noted that "[i]ssues involving federal preemption can be decided either by the Board or the courts in the first instance."

Seattle then initiated a complaint in King County Superior Court, seeking "[a]n order for specific performance of all of BTRC's obligations under the Operating Agreement and Franchise, including but not limited to cooperating with the Trail's construction," a declaration of its rights under the operating agreement and franchise ordinance, and "[a]n injunction enjoining BTRC from taking any further action to preclude, prohibit, or interfere with the Missing Link's construction." BTRC responded that, among other defenses, it was immune from liability under Washington's anti-SLAPP statute. The court issued a series of summary judgment orders, concluding that the operating agreement did not give Seattle the right to require a relocation of BTRC's tracks in the missing link area

---

[4] The City's Environmental Impact Statement has been the subject of other recent litigation. Martin Luther King, Jr. County Labor Council of Wash. v. City of Seattle, No. 79543-1-I (Wash. Ct. App. Mar. 29, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/795431.pdf.

and that the franchise ordinance did purport to give Seattle this right but that this provision was preempted by federal law. The court also denied BTRC's motion for damages and attorney fees under the anti-SLAPP statute. Seattle appeals and BTRC cross-appeals.

ANALYSIS

Standard of Review

"Summary judgment is appropriate where there is no genuine issue as to any material fact, so the moving party is entitled to judgment as a matter of law." Meyers v. Ferndale Sch. Dist., 197 Wn.2d 281, 287, 481 P.3d 1084 (2021). "We view the facts and reasonable inferences in the light most favorable to the nonmoving party." Meyers, 197 Wn.2d at 287. "We review rulings on summary judgment and issues of statutory interpretation de novo." Am. Legion Post No. 149 v. Dep't of Health, 164 Wn.2d 570, 584, 192 P.3d 306 (2008).

Preemption of Franchise Ordinance

Seattle challenges the trial court's conclusion that enforcement of the franchise ordinance is preempted by the ICCTA, contending that the franchise was a voluntary agreement and did not regulate the construction of rail lines. We disagree.

"Under the preemption doctrine, states are deemed powerless to apply their own law due to restraints deliberately imposed by federal legislation." Alverado v. Wash. Pub. Power Supply Sys., 111 Wn.2d 424, 430-31, 759 P.2d 427 (1988).

> Federal preemption is required when Congress conveys an intent
> to preempt local law by: (1) "express preemption", where congress

7

> explicitly defines the extent to which its enactments preempt laws;
> (2) "field preemption", where local law regulates conduct in an area
> the federal government intended to exclusively occupy; and (3)
> "conflict preemption", where it is impossible to comply with both
> local and federal law.

City of Seattle v. Burlington N. R.R. Co., 145 Wn.2d 661, 667, 41 P.3d 1169

(2002) (quoting S. Pac. Transp. Co. v. Pub. Util. Comm'n, 9 F.3d 807, 810 (9th

Cir. 1993)).  In addition to state law, federal preemption also applies to local

ordinances.  Burlington, 145 Wn.2d at 668.

The ICCTA provides that the STB's jurisdiction over "(1) transportation by

rail carriers . . . and (2) the construction, acquisition, operation, abandonment, or

discontinuance of spur, industrial, team, switching, or side tracks, or facilities,

even if the tracks are located, or intended to be located, entirely in one State, is

exclusive."  49 U.S.C. § 10501(b).  This section "expressly preempts any state

law remedies with respect to the routes and services of Board-regulated rail

carriers."  CSX Transp., Inc., 2005 WL 1024490, at *2 (U.S. Surface Transp. Bd.

May 3, 2005); see also Port of Seattle v. Pollution Control Hr'gs Bd., 151 Wn.2d

568, 587, 90 P.3d 659 (2004) (An agency's interpretation of an ambiguous

statute that falls within the agency's expertise is accorded great weight if it does

not conflict with the language of the statute).  Because such remedies "by a state

or local body would directly conflict with exclusive federal regulation of

railroads, . . . the preemption analysis is addressed not to the reasonableness of

the particular state or local action, but rather to the act of regulation itself."  CSX

Transp., 2005 WL 1024490, at *3 (citation omitted).  However, "Congress

narrowly tailored the ICCTA pre-emption provision to displace only 'regulation,'

No. 82377-9-I/9

i.e., those state laws that may reasonably be said to have the effect of 'manag[ing]' or 'govern[ing]' rail transportation while permitting the continued application of laws having a more remote or incidental effect on rail transportation." Florida E. Coast Ry. Co. v. City of W. Palm Beach, 266 F.3d 1324, 1331 (11th Cir. 2001) (alterations in original) (quoting BLACK'S LAW DICTIONARY 1286 (6th ed.1990)). "There is a strong presumption against finding preemption in an ambiguous case, and the burden of proof is on the party claiming preemption." Inlandboatmen's Union of the Pac. v. Dep't of Transp., 119 Wn.2d 697, 702, 836 P.2d 823 (1992) (footnote omitted).

Here, Section 4 of the franchise ordinance reserved for Seattle the "full and complete right of access to any space occupied by [the Ballard Line] tracks and to all of said franchise right-of-way." It provided that "[i]n all cases involving a possibility of such interference, or removal of lateral support or excavation beneath the tracks . . . [BTRC] shall, at its own cost and expense, remove, relocate, support, reinforce said tracks as necessary." This section requires BTRC to reroute its tracks upon notice from Seattle. Therefore, it is a local law remedy "with respect to the routes and services of [a] Board-regulated rail carrier[ ]," and is accordingly preempted by the ICCTA. CSX Transp., 2005 WL 1024490, at *2.

Seattle disagrees and contends that the franchise is a voluntary agreement and therefore is not subject to the preemption claim. It is true that voluntary agreements are not necessarily subject to preemption, Twp. of

9

<u>Woodbridge v. Consol. Rail Corp.</u>, 5 S.T.B. 336 2000 WL 177104, at *3 (2000),

and that case law often characterized franchises as contracts and applies

contract interpretation rules to them, <u>Burns v. City of Seattle</u>, 161 Wn.2d 129,

142, 164 P.3d 475 (2007).  However, our Supreme Court has explicitly noted that

in the context of railroad regulation, a franchise ordinance, "[l]ike any state

law, . . . is subject to Congressional preemption."  <u>Burlington</u>, 145 Wn.2d 661, at

41.  Seattle's argument therefore fails.

Seattle also contends that the STB's exclusive jurisdiction over the

"construction" of tracks under 49 U.S.C. § 10501(b) does not apply to the

relocation of tracks at issue here.  However, to make this argument, Seattle looks

to 49 U.S.C. § 10901(a), which provides that

> A person may--
>
> (1) construct an extension to any of its railroad lines;
>
> (2) construct an additional railroad line;
>
> (3) provide transportation over, or by means of, an extended or additional railroad line; or
>
> (4) in the case of a person other than a rail carrier, acquire a railroad line or acquire or operate an extended or additional railroad line,
>
> only if the Board issues a certificate authorizing such activity.

This section does not attempt to define "construction" or to limit the definition of

"construct" to extensions or additional lines, but instead simply declares that

Board authorization is required for those categories of construction.  Neither

Seattle nor BTRC is seeking a certificate to authorize the relocation of tracks—

instead, Seattle is seeking to use its governmental authority to require BTRC to

relocate its tracks.  This is the kind of local regulation that is not permitted by

49 U.S.C. § 10501(b).  See also H.R. REP. NO. 104-311, at 95-96, reprinted in 1995 U.S.C.C.A.N. 793, 808 ("[T]he Federal scheme of economic regulation and deregulation is intended to address and encompass all such regulation and to be completely exclusive.  Any other construction would undermine the uniformity of Federal standards and risk the balkanization and subversion of the Federal scheme of minimal regulation for this intrinsically interstate form of transportation.").  The cases to which Seattle cites indicate that the STB authorization is not required for the relocation of tracks.  However, they do not establish that Seattle may use its governmental authority to require this relocation.  See Detroit/Wayne County Port Auth. v. I.C.C., 59 F.3d 1314, 1317 (D.C. Cir. 1995) (establishing that "a relocation or an improvement to an existing line that does not extend into new territory is not an extension or addition under section 10901(a).").  Accordingly, we are not persuaded.[5]

Interpretation of Operating Agreement

Seattle contends the trial court erred when it concluded that the operating agreement did not give Seattle the right to require BTRC to move its tracks in the area of the missing link.  It contends that the court's interpretation was not supported by the language of the operating agreement, was contradicted by

---

[5] Seattle also contends that the superior court improperly analyzed the categorical preemption claim as an "as applied" claim and made factual assessments about the effect of Seattle's proposal on BTRC.  Seattle is correct that an as-applied preemption claim involves questions of fact, including about the impact of the relocation on the railroad, that the parties agreed were not before the court on summary judgment.  However, because our review is de novo and there is no dispute of material fact relevant to our determination that the franchise is categorically preempted, we need not address this issue.

extrinsic evidence showing Seattle's intent to construct the missing link, and erroneously conflicted with the franchise ordinance's language. We disagree.

"Washington courts follow the objective manifestation theory of contracts." Pelly v. Panasyuk, 2 Wn. App. 2d 848, 865, 413 P.3d 619 (2018). "Under this approach, we attempt to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005). The "subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used," which are generally given their ordinary, usual, and popular meaning. Id. at 504. "Interpretations giving lawful effect to all the provisions in a contract are favored over those that render some of the language meaningless or ineffective." Grey v. Leach, 158 Wn. App. 837, 850, 244 P.3d 970 (2010).

Furthermore, Washington courts apply the context rule, under which "extrinsic evidence is admissible to ascertain the intent of the parties in entering into a contract and the meaning of the words used in the instrument." Pelly, 2 Wn. App. 2d at 866.

> The court may consider extrinsic evidence concerning (1) the subject matter and objective of the contract, (2) the circumstances surrounding the making of the contract, (3) the subsequent conduct of the parties to the contract, (4) the reasonableness of the parties' respective interpretations, (5) statements made by the parties in preliminary negotiations, (6) usages of trade, and (7) the course of dealing between the parties.

Id. "Extrinsic evidence is not admissible to show 'a party's unilateral or subjective intent as to the meaning of a contract word or term'; to show an intent

12

'independent of the instrument'; or to 'vary, contradict, or modify the written word.' " Id. (quoting Hollis v. Garwall, Inc., 137 Wn.2d 683, 695, 974 P.2d 836 (1999)).

Here, the plain language of the operating agreement does not require BTRC to relocate its tracks in the missing link portion of the Ballard Line. Seattle concedes that "Exhibit D controlled the location of the 'Trail' north and south of the Missing Link area, where the Ballard Line is not in the City's street right-of-way, but that the Operating Agreement did *not* define or restrict the Trail's location" where the missing link is located. The operating agreement's grant of Seattle's "right to require [BTRC] to relocate its track in order to accommodate trail construction in accordance with this Agreement" should therefore be read as being limited to those locations where the operating agreement defined the trail's location. Without this limitation, the language "in accordance with this Agreement" would essentially have no effect, because Seattle would be entitled to require track relocations that were not provided for in the operating agreement. We avoid this interpretation because it results in language in the contract being rendered meaningless. Grey, 158 Wn. App. 850.

Section 10(i) of the operating agreement, which provides that Seattle will "undertake[ ] to provide [BTRC] with 120 days notice . . . prior to [Seattle's] presentation of a request for initial authorization . . . for an extension of the Burke-Gilman Trail in the area between 11th Avenue [NW] and the Locks within the premises," does not require a different result. This language contemplates

13

the possibility that Seattle would pursue building the missing link on Shilshole Avenue NW, as it is doing today. However, it provides only for notice and an opportunity to consult, and does not establish that Seattle has the right to build the trail there. In fact, the special provision for notice about plans to construct on Shilshole Avenue NW supports an interpretation that the requirement that BTRC move its tracks to accommodate construction did not extend to construction of the missing link in that location. Therefore, an objective reading of the operating agreement does not require BTRC to relocate its tracks in the missing link area.

Seattle disagrees and points to contextual evidence, such as the "Joint Statement of Principles", that the Burke-Gilman Trail's "completion was a long-held, critical goal to the City." BTRC does not contest this, but points to other evidence that at the time the parties entered the operating agreement, Seattle was planning a different route for the missing link. For instance, it points to the November 1996 resolution, in which the Seattle City Council stated its support for the "preferred alternative" of the route going up to NW Leary Way and NW Market Street that was depicted in Exhibit D to the operating agreement. Together, the contextual information establishes that (1) Seattle intended to complete the Burke-Gilman Trail, (2) at the time of contracting, its plan for the missing link route involved diverting the trail up to NW Leary Way and NW Market Street, and (3) this plan was not finalized or set in stone and was subject to change. This context is consistent with our interpretation of the operating agreement.

14

Moreover, other evidence indicates that the operating agreement was not intended to authorize construction of the trail on Shilshole Avenue NW. Most significantly, Exhibit H to the operating agreement was an agreed draft letter to the Washington State Department of Transportation seeking grant funds. The letter described the purpose of the agreement between the parties as "permit[ting] the continuation of rail service through a new shortline railroad (BTRC), while at the same time allowing extension of the Burke-Gilman Trail from Eighth Avenue [NW] to [11th] Avenue [NW] and north of the Government Locks." This description specifically excludes the construction of the missing link, which runs between 11th Avenue NW and the Locks. Similarly, Exhibit K to the operating agreement, a memorandum of understanding between Seattle and SLR dated two weeks before the operating agreement was signed, provided that after SLR acquired the line, Seattle would "have a right of entry to perform such surveys and preliminary studies as are reasonable and appropriate to expedite construction of additions to the Burke-Gilman west of the Government Locks and between 8th Avenue [NW] and 11th Avenue [NW]." This evidence indicates that the parties intended that Seattle could require BTRC to relocate its tracks east and west of, but not within, the missing link portion of the line. Seattle's interpretation of the operating agreement is not supported.

Finally, Seattle contends that this reading conflicts with the franchise ordinance, and that the operating agreement and franchise ordinance must be

No. 82377-9-I/16

read harmoniously.[6] "In Washington it is a well-settled principle that written instruments contemporaneously executed as part of the same transaction will be considered and construed as one transaction." Kruger v. Horton, 106 Wn.2d 738, 742, 725 P.2d 417 (1986). "Whether two separate agreements are part of the same transaction depends on the intent of the parties as demonstrated by the agreements." Pelly, 2 Wn. App. 2d at 868.

> '[T]he terms of agreement may be expressed in two or more separate documents, some of these containing promises and statements as to consideration, and others, such as deeds, . . . embodying performances agreed upon rather than a statement of terms to be performed. In every such case, these documents should be interpreted together, each one assisting in determining the meaning intended to be expressed by the others.'

Id. (alterations in original) (quoting Kelley v. Tonda, 198 Wn. App. 303, 311-12, 393 P.3d 824 (2017)).

Here, although the operating agreement and franchise ordinance are related to the same transaction, the terms of the franchise ordinance may not be read into the operating agreement. Seattle's argument that we must interpret the franchise ordinance and operating agreement together relies on case law involving two contracts. Seattle cites no case suggesting that the terms of a preempted ordinance should be read into a valid contract. See DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no

---

[6] BTRC contends that we should not consider this argument because Seattle did not raise it below. However, Seattle did contend that the franchise ordinance's provisions were consistent with the operating agreement and supported its interpretation below. Furthermore, while RAP 2.5(a) empowers this court to "refuse to review any claim of error which was not raised in the trial court," it does not go so far as to say a party may not refine its reasoning behind a claim of error.

16

authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.") Furthermore, even if the franchise ordinance may " 'assist[ ] in determining the meaning intended to be expressed by' " the operating agreement, Pelly, 2 Wn. App. 2d at 868 (quoting Kelley, 198 Wn. App. at 311-12), the terms that give Seattle the unequivocal right to make BTRC relocate its tracks are part of the franchise ordinance, not the operating agreement. Contrary to Seattle's argument, it is not a contradictory reading of the two documents to note that the franchise ordinance states something that the operating agreement does not. Therefore, the franchise ordinance's provisions do not require a different reading of the operating agreement.

### Anti-SLAPP Claim

Finally, BTRC contends that the court erred by denying its claim for attorney fees and damages under Washington's anti-SLAPP statute. Because Seattle's suit is not an action to which the statute applies, we disagree.

RCW 4.24.510 provides that "[a] person who communicates a complaint or information to any branch or agency of federal, state, or local government . . . is immune from civil liability for claims based upon the communication to the agency or organization regarding any matter reasonably of concern to that agency or organization." "A person prevailing upon the defense provided for in this section is entitled to recover expenses and reasonable attorneys' fees incurred in establishing the defense and in addition shall receive statutory

17

damages of ten thousand dollars." RCW 4.24.510. These damages may be denied if the court finds that the complaint or information was communicated in bad faith. RCW 4.24.510.

It is " 'the *principal thrust* or *gravamen* of the plaintiff's cause of action that determines whether the anti-SLAPP statute applies.' " Dillon v. Seattle Deposition Reporters, LLC, 179 Wn. App. 41, 72, 316 P.3d 1119 (2014) (emphasis in original) (quoting Martinez v. Metabolife Intern., Inc., 113 Cal. App. 4th 181, 188 (Cal. App. 2003)); see also Aronson v. Dog Eat Dog Films, Inc., 738 F. Supp. 2d 1104, 1110-11 (W.D. Wash. 2010) ("[T]he act underlying the plaintiff's cause, or the act which forms the basis for the plaintiff's cause of action, must itself have been an act in furtherance of the right of free speech."). Furthermore, the purpose of this statute is to "protect individuals who make good-faith reports to appropriate governmental bodies" because "the threat of a civil action for damages can act as a deterrent to citizens who wish to report information" to these bodies. RCW 4.24.500. Therefore, the term "civil liability" in RCW 4.24.510 should be "construed within the context of the statute's intent and purpose to mean a civil action for damages." Emmerson v. Weilep, 126 Wn. App. 930, 937, 110 P.3d 214 (2005).

BTRC is not entitled to recover under the anti-SLAPP statute because Seattle did not sue for damages, as required under Emmerson. BTRC contends that the language in RCW 4.24.500 should not affect our reading of RCW 4.24.510 because "policy statements do not give rise to enforceable rights

18

and duties." Bailey v. State, 147 Wn. App. 251, 263, 191 P.3d 1285 (2008).

However, it cites no authority overruling the holding of Emmerson. Therefore, we

conclude that BTRC is not entitled to damages or fees under the anti-SLAPP

statute.

We affirm.

_Smith, A.C.J._

WE CONCUR:

_Mann, J._          _Dwyer, J._