**SEA–LAND SERVICE, INC., (PACIFIC DIVISION), Plaintiff–Appellant,**

v.

**INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION, LOCALS 13, 63, AND 94, Defendants–Appellees.**

No. 90–55756.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 7, 1991.

Decided July 29, 1991.

Robert J. Attaway, Haight, Gardner, Poor & Havens, New York City, for plaintiff-appellant.

William H. Carder, Leonard, Carder, Nathan, Zuckerman, Ross, Chin & Remar, San Francisco, Cal., for defendants-appellees.

Before D.W. NELSON, O'SCANNLAIN and TROTT, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

Having won a battle before the National Labor Relations Board ("NLRB"), Sea–Land Service, Inc. ("Sea–Land") seeks to broaden the reach of its victory in its war with the International Longshoremen's and Warehousemen's Union ("ILWU" or "Union").

I

A review of related prior skirmishes between Sea–Land and the ILWU is necessary to understand the present controversy.

Sea–Land transports containerized cargo worldwide, operating its own fleet of specially designed containerships and ground transportation equipment. Sea–Land's Pacific Division operates on the west coast of the United States, including the port of Long Beach, California.

Prior to 1980, Sea–Land maintained two sites in Long Beach for the handling of shipping containers, a thirty-seven acre fenced marine terminal on the waterfront ("container yard") and a fifteen acre container freight station located about two miles inland. The Container Stevedoring Corporation, a second-tier subsidiary of Sea–Land, is under contract with Sea–Land to supply marine yard workers at the dockside container yard. Container Stevedoring's employees are represented by the ILWU. The Teamsters represent Sea–Land's container freight station employees.

Because of over-crowding at the container yard, in 1980 Sea–Land leased a facility across the street from the container yard. This facility is called "Pelican Pond." After leasing Pelican Pond, Sea–Land assigned the work there to its Teamster-represented freight station employees. This decision gave rise to a series of disputes among the Teamsters, the ILWU, and Sea–Land. Both unions claimed their members were entitled to the work at Pelican Pond, asserting that the operations there were merely an extension of the work that each had traditionally performed. The ILWU filed a grievance under its collective bargaining agreement with Sea–Land.[1] In its

---

1. The collective bargaining agreement is formally subscribed to by the ILWU and the Pacific

Maritime Association ("PMA"), a multi-employ-

grievance, the ILWU claimed that it was due "time-in-lieu" payments for the work performed by the Teamsters at Pelican Pond.[2] The area arbitrator, George Love, found Sea–Land in violation of the agreement and ordered Sea–Land to make the payments (award No. SC–31–80). The coast arbitrator, Sam Kagel, upheld the area arbitrator's award on December 7, 1980 (award No. C–31–80). Kagel reasoned that the work at Pelican Pond was merely an "extension of the dock," entitling the ILWU to the work.

Shortly after the Kagel award, the Teamsters threatened to picket Sea–Land if it assigned the work at Pelican Pond to the ILWU. Sea–Land responded by charging that the Teamster threat constituted an unfair labor practice in violation of section 8(b)(4)(ii)(D) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(4)(ii)(D). Following a hearing held pursuant to section 10(k) of the NLRA, 29 U.S.C. § 160(k), the National Labor Relations Board ("NLRB") awarded the work in dispute to the Teamsters. The NLRB's decision rested chiefly upon the relative economy and efficiency of the Teamsters performing the work, and on Sea–Land's preference for the Teamsters. Notably, the NLRB refused to consider the contents of either the Teamsters' or the ILWU's collective bargaining agreements, observing that none of the parties had entered the agreements into evidence. Rather, the Board placed particular emphasis on the fact that "[t]he record ... clearly discloses that assigning the work to longshoremen rather than to teamsters would require the Employer to utilize a greater number of employees." The ILWU unsuccessfully moved for reconsideration of the Board's decision, but did not otherwise seek to challenge the Board's determination.

After the section 10(k) order issued in September 1981, Sea–Land used the Teamsters to perform the contested work at Pelican Pond. However, the ILWU felt

that Sea–Land had adopted an unduly broad interpretation of the order and, on January 10, 1983, the ILWU again filed grievances, claiming that Sea–Land was violating its collective bargaining agreement with PMA by assigning to the Teamster-represented employees work at Pelican Pond not covered by the order. Arbitrator Love determined that Sea–Land was in violation of the contract (award No. SC–6–83). Sea–Land paid the ILWU $4,300 under protest, but continued to assign the disputed work to the Teamsters. On January 24, 1983, Richard Lomelli, a business agent of Local 13 of the ILWU, told a Sea–Land representative that he would "walk the gang" if Teamsters continued to perform work at Pelican Pond.

On January 26, 1983, Sea–Land filed a new section 8(b)(4)(ii)(D) charge, this time against the ILWU. Sea–Land also filed this action in federal district court seeking to vacate the arbitration awards upon which the ILWU was basing its claims, and to enjoin the ILWU from filing further grievances claiming time-in-lieu payments and from threatening work stoppages in connection with Pelican Pond. The district court stayed the action pending resolution of the NLRB proceedings.

A second 10(k) hearing was held before the NLRB. The NLRB issued its decision on July 29, 1988, in which it rejected the ILWU's contentions. It was "crystal clear," the NLRB concluded, that the challenged work was virtually identical to the work previously awarded to the Teamsters. The NLRB issued a cease-and-desist order which enjoined any further claims for work or time-in-lieu claims based on the Kagel and Love awards.

The ILWU petitioned the Court of Appeals for the District of Columbia for review of the NLRB decision; the NLRB filed a cross-application seeking enforcement of its decision and order. The court of appeals issued its decision on September

---

er bargaining group of which Sea–Land is a member.

**2.** A claim for "time-in-lieu" payments is made when one employee group asserts a right to

payment for work it believes it was entitled to perform, but did not because it was not assigned the work.

5, 1989, rejecting the ILWU's arguments and granted the NLRB's cross-application for enforcement of its order. *See International Longshoremen's & Warehousemen's Union v. NLRB*, 884 F.2d 1407 (D.C. Cir.1989).

Meanwhile, another dispute regarding work assignments arose between the ILWU and Sea–Land, not involving work at Pelican Pond. On January 15, 1987, arbitrator Love found in favor of the ILWU in this dispute (the "third Love award"), specifically basing his award on the "extension of the dock" theory he had articulated in the previous Kagel and Love awards. Moreover, on January 29, 1990, counsel for the ILWU announced in a letter to the NLRB that while the ILWU would no longer seek to enforce the arbitration awards with respect to Pelican Pond, it still considered the awards fully valid for all other purposes and intended to continue citing the void awards as "precedent" in other economic actions against Sea–Land.

On March 15, 1990, the district court lifted the stay in Sea–Land's original action, and Sea–Land filed a motion for summary judgment seeking to have the arbitration awards either declared void as a matter of law or vacated. On March 23, 1990, the ILWU filed a cross-motion for summary judgment, claiming that Sea–Land's action was moot. On May 7, 1990, the district court dismissed Sea–Land's action on jurisdictional grounds. This appeal followed.[3]

## II

In its pleadings before the district court, Sea–Land asked for the following injunction:

That Defendants, their officers, agents, members and other persons in active concert or participation with them are permanently enjoined and restrained from in any manner:

(a) Threatening, instigating, directing, causing, assisting, encouraging, or participating in any strike or work stoppage, slow-down, picketing, or interruption of work in connection with work at Pelican Pond;

(b) Filing any claims for money in lieu of lost work opportunities in connection with work at Pelican Pond; and

(c) Instituting any further claims, proceedings or economic actions based on arbitration awards SC–6–83, C–31–80, or SC–31–80.

In addition, Sea–Land sought a declaration that arbitration awards SC–6–83, C–31–80 and SC–31–80 are null and void as a matter of law, or, in the alternative, an order vacating the foregoing arbitration awards. The district court denied Sea–Land's requests for relief and dismissed Sea–Land's complaint for want of jurisdiction, stating:

The Court finds that, under all the circumstances the undisputed facts do not show that there is a substantial controversy between parties having adverse legal interest of sufficient immediacy and reality to warrant the relief plaintiff seeks. Without such controversy, the Court is without jurisdiction over this action.

While not expressly identifying either doctrine, the district court's holding implicates the doctrines of both mootness and ripeness. Mootness, of course, suggests that the "live controversy" has passed, while ripeness suggests that such controversy has yet to occur. *See Western Oil & Gas Ass'n v. Sonoma County*, 905 F.2d 1287, 1290 (9th Cir.1990) ("The ripeness inquiry asks whether there yet is any need for the court to act, while the mootness inquiry asks whether there is anything left for the court to do.") (quotations omitted), *cert. denied,* ––– U.S. –––, 111 S.Ct. 784, 112 L.Ed.2d 846 (1991). Here, resolution of the dispute regarding Pelican Pond itself suggests that the action might be moot;

---

**3.** The district court had jurisdiction under section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. *See Kemner v. District Council of Painting and Allied Trades No. 36*, 768 F.2d 1115, 1118 (9th Cir.1985). As the district court's order dismissing this action was a final judgment, this court has jurisdiction pursuant to 28 U.S.C. § 1291.

We review a grant of summary judgment de novo. *See Columbia Pictures Industries, Inc. v. Professional Real Estate Investors, Inc.*, 866 F.2d 278, 279 (9th Cir.1989).

similarly, the absence of a current grievance involving the Pelican Pond arbitration awards suggests that the case might be unripe.

■ We first consider whether Sea–Land's requests for relief regarding Pelican Pond itself are moot. Mootness is, of course, a threshold jurisdictional issue. *See Koppers Indus. v. EPA*, 902 F.2d 756, 758 (9th Cir.1990); *see also Deakins v. Monaghan*, 484 U.S. 193, 199, 108 S.Ct. 523, 528, 98 L.Ed.2d 529 (1988) ("Article III of the Constitution limits federal courts to the adjudication of actual, ongoing controversies between litigants."). A case becomes moot when "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Murphy v. Hunt*, 455 U.S. 478, 481, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) (per curiam). As we stated in *Northwest Environmental Defense Center v. Gordon*, 849 F.2d 1241 (9th Cir.1988):

> The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted. We have pointed out that courts of equity have broad discretion in shaping remedies. Thus, in deciding a mootness issue, the question is not whether the precise relief sought at the time the application for an injunction was filed is still available. The question is whether there can be *any* effective relief.

*Id.* at 1244–45 (quotations and citations omitted; emphasis in original). "Where one of the several issues presented becomes moot, the remaining live issues supply the constitutional requirement of a case or controversy." *Powell v. McCormack*, 395 U.S. 486, 497, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). The burden of demonstrating mootness is, of course, a heavy one. *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979).

There can be no doubt that Sea–Land's requests for relief concerning Pelican Pond are moot. Relief from another tribunal can moot an action. *See Enrico's, Inc. v. Rice*, 730 F.2d 1250, 1253–54 (9th Cir.1984) (decision by California Court of Appeal mooted petitioner's request for injunctive relief in federal district court). While it is true that voluntary cessation of allegedly illegal conduct does not necessarily deprive a court of power to grant injunctive relief, *see id.* at 1253, "legally compelled" cessation of such conduct is not "voluntary" for purposes of this exception to the mootness doctrine. *Id.* Here, the ILWU was ordered by the District of Columbia Circuit to comply with the NLRB's ruling, and the ILWU has announced its intention to comply. Under these circumstances, Sea–Land's requests for relief regarding Pelican Pond are moot.

■ Having concluded that the Pelican Pond dispute itself is moot, we must next consider whether the absence of a specific controversy over the application of the Pelican Pond arbitration awards renders the remaining claims for injunctive and declaratory relief unripe.[4] Ripeness is a close cousin to mootness. *See Fortson v. Toombs*, 379 U.S. 621, 631, 85 S.Ct. 598, 603–04, 13 L.Ed.2d 527 (1965). "Ripeness is peculiarly a question of timing. Its basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580, 105 S.Ct. 3325, 3332–33, 87 L.Ed.2d 409 (1985) (citations, quotations, and brackets omitted).

> In considering whether a case is ripe, a court must evaluate the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final.

*Winter v. California Medical Review, Inc.*, 900 F.2d 1322, 1325 (9th Cir.1990) (citations and quotations omitted). "One

---

**4.** The parties have briefed only mootness. However, since ripeness, like mootness, is a threshold jurisdictional issue, we may—indeed, we must—consider the issue *nostra sponte*. *See Metropolitan Washington Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc.*, —— U.S. ——, —— n. 13, 111 S.Ct. 2298, 2306 n. 13, 115 L.Ed.2d 236 (1991).

does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Thomas,* 473 U.S. at 581, 105 S.Ct. at 3333 (quotation omitted). Like mootness, the basic question in determining if a claim is ripe is whether there is a present controversy as to which effective relief can be granted. *See Western Oil & Gas,* 905 F.2d at 1291.

The case is ripe. The issues presented are exclusively legal. Moreover, the dispute is neither hypothetical nor abstract; we have before us the contested arbitration awards, the NLRB's 10(k) determination, and a subsequent arbitration award in which the Union relied upon the earlier awards. These factors make the Union's present threat to continue to rely upon the earlier awards "sufficiently real and immediate to show an existing controversy." *O'Shea v. Littleton,* 414 U.S. 488, 496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974); *see also Blum v. Yaretsky,* 457 U.S. 991, 999–1001 (1982) (allowing nursing home residents to sue to prevent threatened transfers); *Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 1215–16, 39 L.Ed.2d 505 (1974) (allowing action for declaratory relief based on threats of enforcement of antibilling statute); *cf. Edward J. DeBartolo Corp. v. NLRB,* 463 U.S. 147, 153 n. 5, 103 S.Ct. 2926, 2930–31 n. 5, 77 L.Ed.2d 535 (1983) (successful state court challenge to union handbill distribution at shopping center did not moot an unfair labor practice charge where union maintained it had a right to engage in comparable handbilling in the future). Accordingly, we turn to the merits of Sea–Land's complaint.

## III

■ The Union contends that Sea–Land's true objective in this case is to obtain an unfair labor practice remedy from the district court, a remedy not within this court's arsenal. The NLRB possesses exclusive jurisdiction over activities that threaten to interfere with national labor policy, including charges of unfair labor practices. *See Lumber Production Industrial Workers Local #1054 v. West Coast Industrial Re-* *lations Ass'n,* 775 F.2d 1042, 1045 (9th Cir.1985). However, "[w]hen a labor dispute involves both a breach of contract and an unfair labor practice charge, the NLRB and the courts have concurrent jurisdiction." *Sheet Metal Workers Int'l Ass'n, Local No. 162 v. Jason Manufacturing, Inc.,* 900 F.2d 1392, 1400 (9th Cir.1990); *see also Smith v. Evening News Ass'n,* 371 U.S. 195, 197, 83 S.Ct. 267, 268–69, 9 L.Ed.2d 246 (1962). Sea–Land's complaint falls in the latter category. Sea–Land's argument is, in essence, that the collective bargaining agreement must be construed in accord with the NLRB's 10(k) determination. As such, the dispute entails interpretation of the collective bargaining agreement. Accordingly, the NLRB's jurisdiction is not exclusive, and Sea–Land's complaint comes within the parameters of this court's concurrent jurisdiction.

## IV

Neither party in this case contests that the NLRB's decision superseded the arbitration awards with respect to the Pelican Pond dispute. Rather, the parties differ on the impact of the awards on future labor disputes. Sea–Land contends that the NLRB's decision rendered the awards void in all respects, that the NLRB necessarily rejected both the arbitrator's result and reasoning. In contrast, the Union asserts that an arbitrator's award has continued vitality where the only issue before the arbitrator is strictly one of interpretation of the collective bargaining agreement and no jurisdictional dispute exists. Resolution of this question requires an understanding of the relationship between an arbitration award and an NLRB 10(k) determination.

This court discussed the role of arbitration in labor disputes at length in *Stead Motors of Walnut Creek v. Automotive Machinists Lodge No. 1173,* 886 F.2d 1200 (9th Cir.1989) (en banc), *cert. denied,* —— U.S. ——, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990). In *Stead Motors,* Judge Reinhardt, writing for a plurality, described the arbitration process as follows:

Arbitration is a central feature of the collective bargaining process, designed to

function alongside the labor contract in maintaining equity and a balance of power in the workplace.... The arbitrator under such a scheme serves a function somewhat different from that served by the arbitrator in the commercial context.... Unlike the commercial contract, which is designed to be a comprehensive distillation of the parties' bargain, the collective bargaining agreement is a skeletal, interstitial document. The labor arbitrator is the person the parties designate to fill in the gaps; for the vast array of circumstances they have not considered or reduced to writing, the arbitrator will state the parties' bargain. He is the parties' officially designated "reader" of the contract[,] their joint *alter ego* for the purpose of striking whatever supplementary bargain is necessary....

    \*      \*      \*      \*      \*      \*

In the absence of fraud or an overreaching of authority on the part of the arbitrator, he is speaking for the parties, and his award *is* their contract.

*Id.* at 1205 (plurality) (emphasis in original; citations, quotations, and ellipses omitted).[5]

While arbitration is available to parties to resolve disputes under a collective bargaining agreement, the NLRA provides a different mechanism to resolve jurisdictional disputes between two or more unions. Section 8(b)(4)(ii)(D) of the NLRA, 29 U.S.C. § 158(b)(4)(ii)(D), makes it an unfair labor practice for a labor organization to threaten, coerce or restrain any person engaged in commerce with the object of forcing or requiring any employer to assign particular work to employees belonging to one labor organization rather than employees belonging to another labor organization. *USCP–Wesco, Inc. v. NLRB*, 827 F.2d 581, 583 (9th Cir.1987).[6] Section 10(k) of the same act states that whenever a section 8(b)(4)(ii)(D) charge has been levied, "the Board is empowered and directed to hear and determine the dispute." *Id.* (quoting 29 U.S.C. § 160(k)).

In resolving a jurisdictional dispute, the NLRB is not bound by the applicable collective bargaining agreements. Rather, "the Board may consider and weigh all factors that it deems relevant in light of its experience and common sense." *J.F. White Contracting Co. v. Local 103 Int'l Brotherhood of Electrical Workers*, 890 F.2d 528, 530 (1st Cir.1989). The Board has explained:

Each case will have to be decided on its own facts. The Board will consider all relevant factors in determining who is entitled to the work in dispute, e.g., the skills and work involved, certifications by the Board, company and industry practice, agreements between unions and between employers and unions, awards of arbitrators, joints boards, and the AFL–CIO in the same or related cases, the assignment made by the employer, and the efficient operation of the employer's business.

*International Ass'n of Machinists, Lodge No. 1743, AFL–CIO & J.A. Jones Constr. Co.*, 135 N.L.R.B. 1402, 1410–11 (1962).

■ We have previously held that when an arbitrator awards work to one union, but the NLRB gives the work to another union, the NLRB's determination supersedes the arbitration award. *See International Longshoremen's and Warehousemen's Union, Local 32 v. Pacific*

---

**5.** Although Judge Reinhardt commanded only a plurality for his opinion, none of the remaining judges indicated any disagreement with his description of the arbitration process.

**6.** Section 8(b)(4)(ii)(D) provides in pertinent part that:

  (b) It shall be an unfair labor practice for a labor organization, or its agents—

    (4) ... (ii) to threaten, coerce, or restrain any person engaged in commerce, or in an industry affecting commerce, where in either case an object thereof is—

  (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another trade, craft or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work.

29 U.S.C. § 158(b)(4)(ii)(D).

*Maritime Ass'n,* 773 F.2d 1012, 1016 (9th Cir.1985) (hereinafter *ILWU, Local 32*), *cert. denied,* 476 U.S. 1158, 106 S.Ct. 2277, 90 L.Ed.2d 720 (1986). However, Sea–Land argues for more. Sea–Land contends that a subsequent 10(k) determination invalidates in all respects a prior arbitration award. In *ILWU, Local 32,* we reasoned: "Congress intended to make the section 10(k) proceeding the peaceful and binding final determination of a disputed work assignment." *Id.* at 1020 (quotation omitted). Thus, the court, following the Fifth and Sixth Circuits, concluded that "a section 10(k) determination made subsequent to an arbitration award will effectively void the preceding award." *Id.* (citing *United Auto Workers v. Rockwell Int'l Corp.,* 619 F.2d 580, 583 (6th Cir.1980), and *New Orleans Typographical Union No. 17 v. NLRB,* 368 F.2d 755, 767 (5th Cir.1966)). This result occurs even without any action by either the loser of the arbitration or the NLRB. *Id.*

*ILWU, Local 32* does not, however, support Sea–Land's "complete rejection" theory. The NLRB, at least in its jurisdictional dispute-resolution capacity, is simply not an arbiter of collective bargaining agreement disputes. To allow the NLRB to supersede arbitration awards beyond what is needed to resolve the specific jurisdictional dispute at issue would undermine Congress's intent regarding the role of arbitration. *See Carey v. Westinghouse Elec. Corp.,* 375 U.S. 261, 265, 84 S.Ct. 401, 405–06, 11 L.Ed.2d 320 (1964) ("The underlying objective of the national labor laws is to promote collective bargaining agreements and to help give substance to such agreements through the arbitration process.") (quotation omitted). An NLRB 10(k) determination takes precedence over an arbitration award, but only to the extent necessary to effectuate the 10(k) determination.

Here, the "extension of the dock" theory was never entertained by the NLRB in its resolution of the Pelican Pond dispute. Indeed, while the NLRB had broad powers in the 10(k) proceeding, it never considered the collective bargaining agreement in reaching its decision. We express no opinion as to the propriety of applying the "extension of the dock" theory to other disputes, other than to note that the theory has not been rejected by the NLRB.

## V

■ Finally, Sea–Land contends that even if the arbitration awards are not automatically void as a result of the section 10(k) determination, they should be vacated as contrary to public policy. "One of the exceptions to the requirement that courts defer to the awards of arbitrators is the now-settled rule that a court need not, in fact cannot, enforce an award which violates public policy." *Stead Motors,* 886 F.2d at 1209 (plurality) (footnote omitted); *see also W.R. Grace & Co. v. Local Union 759,* 461 U.S. 757, 766, 103 S.Ct. 2177, 2183–84, 76 L.Ed.2d 298 (1983) ("As with any contract, ..., a court may not enforce a collective-bargaining agreement that is contrary to public policy."). "[A] court's refusal to enforce an arbitrator's *interpretation* of such contracts is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.,* 484 U.S. 29, 43, 108 S.Ct. 364, 373, 98 L.Ed.2d 286 (1987) (emphasis in original; quotations omitted).

Sea–Land argues that the arbitration awards violate public policy because they are in express conflict with subsequent, superior NLRB decisions and with the decision of the Court of Appeals for the District of Columbia. This contention is without merit. As previously noted, the *results* of the arbitration awards and the NLRB/Court of Appeals decisions may conflict, but the *reasoning* does not. Thus, continued reliance on the arbitration awards' reasoning by either the Union or the arbitrator does not violate a well-defined or dominant public policy. Accordingly, we will not vacate the awards on public policy grounds.

The district court's dismissal of this action on jurisdictional grounds is VACATED; the matter is REMANDED to the district court with instructions to enter judgment for the defendant-appellee.

VACATED AND REMANDED.