**Aja TERMINE, by and through her Guardian Ad Litum Karen TERMINE, and Karen Termine, Plaintiffs,**

v.

**WILLIAM S. HART UNION HIGH SCHOOL DISTRICT, and Westmark School, Defendants.**

No. CIV.02–01114–SVW.

United States District Court, C.D. California.

Aug. 20, 2002.

Steven M. Wyner, Steven M. Wyner Law Office, Manhattan Beach, CA, Marcy J. K. Tiffany, Marcy J. K. Tiffany Law Offices, Rancho Palos Verdes, CA, for Plaintiffs.

Barrett K. Green, Steven Andrew Groode, Littler Mendelson, Los Angeles, CA, Harold Gutenberg, Greenberg & Bass, Encino, CA, Bonnie Z. Yates, Bonnie Z. Yates Law Offices, Los Angeles, CA, for Defendants.

## ORDER RE: "STAY–PUT" DETERMINATION

WILSON, District Judge.

## I. INTRODUCTION

Plaintiff Aja Termine ("Aja"), through her mother and Plaintiff Karen Termine (collectively "Plaintiffs"), seek a determination by the Court, pursuant to 20 U.S.C. § 1415(j), as to what is the appropriate "stay put" placement for Aja during the pendency of Plaintiffs' due process hearing with Defendant William S. Hart Union High School District (the "District") before the California Special Education Hearing Office ("SEHO").[1]

Previously, the Court had instructed the parties to brief the issue of whether equi-table defenses could be considered in determining the "stay put" under § 1415(j), as well as whether this action was rendered moot as a consequence of the SEHO decision issued on July 3, 2002. The parties came before the Court on oral argument on May 8, 2002 and August 19, 2002. Pursuant to the parties' briefs and oral arguments, the Court has resolved all of the issues pending before it, as set forth below.

## II. FACTUAL / PROCEDURAL BACK-GROUND

According to the parties' briefs and accompanying declarations, Aja has been eligible for special education pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., since February 1997.[2] Since March 2000, Aja has been attending Defendant Westmark School ("Westmark"), which is a nonpublic school in Encino, California. Pursuant to a February 28, 2001 IEP with the Glendale School District, where Aja had previously been enrolled, Aja was permitted to continue her placement at Westmark, and she enrolled for the 2001–02 school year. On October 3, 2001, after relocating from the Glendale School District to the Hart School District, Aja enrolled in the Hart School District.

According to the District, pursuant to Cal.Educ.Code § 56325(a),[3] its representatives attempted to set-up two IEP team

---

1. "Stay put" is the name commonly associated with the placement of a child during the pendency of any proceedings conducted pursuant to 20 U.S.C. § 1415, as set forth in 20 U.S.C. § 1415(j).

2. Under the IDEA, all state and local education agencies receiving funding under the act are required to provide students with disabilities with free appropriate public education ("FAPE") through an individualized education program ("IEP"). *See, e.g.,* 20 U.S.C. §§ 1412(a)(1), 1414(d).

3. Cal.Educ.Code § 56325(a) states:
    Whenever a pupil transfers into a school district from a school district not operating programs under the same local plan in which he or she was last enrolled in a special education program, the administrator of a local program under this part shall ensure that the pupil is immediately provided an interim placement for a period not to exceed 30 days. The interim placement must be in conformity with an individualized education program, unless the parent or guardian agrees otherwise. The individualized education program

meetings with Ms. Termine, Aja's mother. Due to problems between the parties, no meeting took place.[4] On October 18, 2001, the District conducted a meeting without the presence of Ms. Termine, purportedly in order to abide by section 56325. The District determined, based on Aja's existing IEP, that the District had programs within the school district sufficient to meet Aja's needs as addressed in the existing February 2001 IEP. Accordingly, the District proposed a program intended to be, at the very least, Aja's interim placement, pursuant to section 56325(a).

On or about October 19, 2001, Defendant's counsel faxed a letter to Mr. Wyner, Plaintiffs' counsel, which included the October 18th interim placement and the accompanying program description, and requested that Ms. Termine and Mr. Wyner set up another meeting with the IEP team, and that Ms. Termine execute the assessment plan so that the District could properly assess Aja in conjunction with a permanent placement proposal upon completion of the interim placement. Again, no further meeting took place between the parties.

On December 27, 2001, Plaintiffs filed a request for a due process hearing with the SEHO. Plaintiffs also sought a stay put order directing the District to maintain Aja's placement at Westmark. That request was denied on January 17, 2002.

On February 2, 2002, Plaintiffs filed a complaint for injunctive relief in this Court. On February 14, 2002, this Court denied Plaintiffs' request for a temporary restraining order and preliminary injunction. On March 11, 2002, the SEHO denied Plaintiffs' February 13, 2002 motion for clarification of its previous order denying the "stay put."[5] In the weeks following, several hearings were conducted in this Court in anticipation of an upcoming trial. The parties were ordered to brief the issue of whether equitable defenses were relevant to the final determination of the "stay put." On May 8, 2002, a hearing was conducted to discuss this issue, as well as to clarify any remaining issues for trial. At that hearing, the Court noted that equitable defenses did not appear relevant to the stay put determination, and it appeared that there were no further disputed issues of material fact remaining in this case.

On July 3, 2002, the SEHO issued its decision for the due process hearing requested on December 27th. As part of that decision, the SEHO determined the proper apportionment of payment between the parties for Aja's education at Westmark during the pendency of the action. Furthermore, the SEHO made arrangements for an IEP team meeting to decide Aja's placement for the upcoming 2002–2003 school year. On July 16, 2002, this Court issued an Order To Show Cause Why Action Should Not Be Dismissed As Moot. In that Order, the Court noted that Aja's educational placement had remained at all times at Westmark during the time between filing for the due process hearing and the July 3rd decision. Therefore, be-

---

implemented during the interim placement may be either the pupil's existing individualized education program, implemented to the extent possible within existing resources, which may be implemented without complying with subdivision (a) of Section 56321, or a new individualized education program developed pursuant to Section 56321.

**4.** The facts surrounding these issues are discussed in more detail in the Court's February

14, 2002 Order Denying Plaintiffs' Application for Temporary Restraining Order and Preliminary Injunction.

**5.** It is unclear whether Plaintiffs' February 13th motion to the SEHO was intended to be a motion for clarification, but that determination is irrelevant for the purposes of this discussion.

cause the due process hearing had concluded, and because the payment for Aja's education while the due process hearing was pending had been decided, the Court directed Plaintiffs to show cause why the issue of the "stay put" placement was not moot.

At oral argument on August 19, 2002, the Court recognized that the stay put determination was not moot. Therefore, since the parties concede that the record before the Court is complete, and all of the relevant facts are no longer in dispute, the Court can issue a decision on all of the issues before it.

## III. ISSUES BEFORE THE COURT

1. What is the source of the Court's jurisdiction?
2. Is this action moot?
3. Can the Court consider equitable defenses in determining the appropriate "stay put"?
4. What criteria should the Court consider in determining the appropriate "stay put"?
5. How does Cal.Educ.Code § 56325 effect the Court's determination?

## IV. ANALYSIS

### A. What is the source of the Court's jurisdiction?

■ The Court has jurisdiction to hear disputes under the IDEA pursuant to 20 U.S.C. § 1415(i)(3)(A). However, this jurisdiction is generally as a reviewing court for an underlying decision by the State educational agency, in this case the SEHO. *See* 20 U.S.C. § 1415(i)(2)(A). Neverthe-

less, other district courts have made "stay put" determinations without a previous SEHO determination on the issue. *See Cole v. Metro. Gov't of Nashville and Davidson County, Tenn.,* 954 F.Supp. 1214, 1219–22 (M.D.Tenn.1997); *Drinker v. Colonial School Dist.,* 78 F.3d 859, 861–63 (3d Cir.1996); *see also Honig v. Doe,* 484 U.S. 305, 329, 108 S.Ct. 592, 607, 98 L.Ed.2d 686 (1988) (affirming lower courts's injunction directing the school district to permit the student to remain at school). Therefore, an action seeking a "stay put" enforcement pursuant to section 1415(j) can be brought directly in this Court, without any previous administrative determination.

That notwithstanding, before filing this action on February 2, 2002, Plaintiffs had already sought a ruling from the SEHO that Westmark was the appropriate "stay put" determination. The SEHO determined instead that "for purpose of stay put, the District must provide [Aja] with an interim placement in conformity with her last operative Glendale IEP." SEHO's January 16, 2002 Order, at 2. Therefore, it seems that this action must be an appeal of that determination, otherwise Plaintiffs are essentially getting the proverbial second bite at the apple. While such an appeal would also be permissible under the IDEA, that might change the determination of equitable considerations, discussed below. Under section 1415(i)(2)(B)(iii), the Court is permitted to "grant such relief as the court determines is appropriate." Thus, there seems to be no limit on what the Court could determine as appropriate under that standard.[6]

---

6. In *K.T. v. West Orange Bd. of Educ.,* No. 01–CIV–3208, 2001 WL 1715787 (D.N.J. Oct.23, 2001), the plaintiff was seeking a preliminary injunction from the district court according to section 1415(j), during the pendency of the action before the court challenging the child's proposed educational placement. There had been a previous decision by an Administrative

Law Judge at a due process hearing regarding the child's appropriate placement, but the action before the district court was not stylized as an appeal of that decision. While the court recognized this, it determined that it was immaterial for the purposes of issuing a "stay put," since "the 'stay put' provision applies

Plaintiffs seem to argue that the Court is not merely reviewing the SEHO's previous "stay put" determination, because the SEHO did not make a previous "stay put" determination. Instead, the SEHO denied the "stay put" at Westmark, but did not identify precisely where that "stay put" should have been. Plaintiffs would argue that this is impermissible, because section 1415(j) unequivocally states that the child "shall remain in the then-current educational placement" during the pendency of a due process hearing. Thus, the SEHO must make a determination of the placement for the "stay put." Furthermore, when Plaintiffs filed a second request to the SEHO, entitled "Motion for Designation and/or Identification of Stay Put Placement," the SEHO treated this as a motion for clarification, and held that "the District is required to provide Aja with a stay put placement in conformity with her February 28, 2001 IEP." SEHO's March 11, 2002 Order, at 3. Again, the SEHO did not identify the specific placement, or decide whether the interim placement designated by the District was "in conformity with" Aja's IEP.

However, the Court is not aware of any law that would hold that the SEHO's directive to the District to offer interim placement in conformity with the Glendale IEP for purposes of the "stay put" is an insufficient specification of the "stay put" placement, and therefore Plaintiffs' contention that this is not an appeal of the SEHO's "stay put" determination is a weak one. Nevertheless, the Court clearly has jurisdiction over this action in one form or another, and thus it is not necessary to determine the source of that jurisdiction for the purposes of resolving the appropriate "stay put" placement.

**B. Is this action moot?**

█ The Court finds that this action is not moot. As Plaintiffs point out, the SEHO's July 3rd decision was based on different legal principles than the "stay put" provision before this Court. More specifically, the SEHO decided the issue of whether the District failed to offer "free appropriate public education," or "FAPE," during the period that Aja was enrolled in the Hart School District (in other words, since October 3, 2001). *See* SEHO's July 3, 2002 Order, at 4. In this regard, the SEHO found that "the District failed to offer Aja an appropriate 30–day interim placement from October 3, 2001 through October 18, 2001. On October 18, 2001, the District offered Aja an appropriate interim placement, which expired on November 2, 2001. From November 2, 2001, up through the date of this decision [July 3, 2002], the District has denied Aja a FAPE." *Id.* at 16.

Accordingly, the SEHO determined that Plaintiffs were entitled to reimbursement for Aja's private placement at Westmark during that period.[7] However, relying on

---

'during the pendency of *any* proceedings conducted *pursuant* to' 20 U.S.C. § 1415 (emphasis added)." *Id.* at *2–3. Since the action before the district court was clearly pursuant to section 1415, the child was entitled to remain at his then-current educational placement during the pendency of the action. Nevertheless, the facts of that case differ from this case, because here the SEHO made a ruling as to the *"stay put" placement* during the pendency of the underlying due process hearing. Additionally, the action before this Court is not seeking a determination of Aja's

proper permanent placement, but is only seeking a "stay put" order during the pendency of the same due process hearing on which the SEHO made its "stay put" decision based on the same law.

7. While recognizing that this was not precisely a reimbursement situation—since no party had actually paid Westmark for Aja's education during the disputed period—the SEHO decided that the situation was akin to a request for reimbursement.

*School Comm. of the Town of Burlington v. Dept. of Educ.,* 471 U.S. 359, 369, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385 (1985), 20 U.S.C. § 1415(i), and 34 C.F.R. § 300.403(d)(3), the SEHO decided that the factual circumstances surrounding Plaintiff counsel's "unreasonable, dilatory actions"—as identified in this Court's February 16th Order—warranted reducing the amount of reimbursement by one half. *See* SEHO's July 3, 2002 Order, at 17–18.

The present action is seeking relief pursuant to section 1415(j).[8] The only determination that the Court needs to make, as set forth in more detail below, is what was Aja's "then-current educational placement" during the pendency of the due process hearing. If the Court determines that it was Westmark, then the District would be required to fund that placement, and Plaintiffs would get full reimbursement of the tuition. *See Cole,* 954 F.Supp. at 1222–23; *Drinker,* 78 F.3d at 867.[9] If the Court determines that the "stay put" is the interim placement proposed by the District, then the SEHO's reimbursement determination would hold, since the SEHO upheld Plaintiffs' decision to place Aja at a private institution instead of the interim placement during the pendency of the due process hearing, since the District had failed to offer FAPE during that period.

According to the Ninth Circuit, "The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted. We have pointed out that courts of equity have broad discretion in shaping remedies. Thus, in deciding a mootness issue, the question is not whether the precise relief sought at the time the application for an injunction was filed is still available. The question is whether there can be any effective relief." *Sea–Land Service, Inc. v. Int'l Longshoremen's and Warehousemen's Union,* 939 F.2d 866, 870 (9th Cir. 1991) (citing *Northwest Envtl. Defense Center v. Gordon,* 849 F.2d 1241, 1244–45 (9th Cir.1988)). An issue made in one forum does not make an issue in another forum moot, provided the first decision did not "grant the precise relief sought by the plaintiffs" in the second forum. *Wright v. Giuliani,* 230 F.3d 543, 547 (2d Cir.2000). Thus, since "effective relief" can still be granted to Plaintiffs, in the form of requiring the District to fully reimburse Plaintiffs for Aja's placement at Westmark, this case is not moot. *See Sea–Land Service,* 939 F.2d at 870.

**C. Can the Court consider equitable defenses in determining the appropriate "stay put"?**

The District does not put forth a convincing argument that equitable defenses should be considered in fashioning the proper "stay put" pursuant to 20 U.S.C. § 1415(j).[10] The bulk of its argument

---

8. Regardless of whether this action should be stylized as an appeal or a direct application of the "stay put" provision, the operative legal basis for the "stay put" placement is section 1415(j).

9. The Court finds that such a ruling would not create an irreconcilable conflict with the SEHO's July 3rd Order, since it is based on different legal principles. However, the Court could envision a potential conflict between such a ruling and the SEHO's January 17th and March 11th decisions regarding the "stay put." Accordingly, this action appears

more appropriately an appeal of those decisions.

10. The Court recognizes that the Court had considered equitable factors in its denial of a temporary restraining order and preliminary injunction. However, while the Court is permitted to consider equitable factors in a preliminary injunction, particularly if the Court is enjoining the enforcement of a previous "stay put" ruling by the SEHO (*see Johnson v. SEHO,* infra), equitable defenses should not be considered in ultimately deciding the "then-current educational placement" for the purposes of the "stay put."

hinges on attempting to distinguish between "balancing of equities," which is expressly prohibited in certain cases, with "equitable defenses," which has not been specifically addressed. The Court does not find this distinction persuasive grounds for considering equitable defenses.

In *Honig v. Doe*, supra, the Supreme Court held the following: "The language of § 1415(e)(3) is unequivocal. It states plainly that during the pendency of any proceedings initiated under the Act, unless the state or local educational agency and the parents or guardian of a disabled child otherwise agree, 'the child *shall* remain in the then current educational placement.'" *Id.*, 484 U.S. at 323, 108 S.Ct. at 604 (quoting § 1415(e)(3) (emphasis added)).[11]

In *Zvi D. v. Ambach*, 694 F.2d 904 (2d Cir.1982), the Second Circuit described the "stay put" provision as follows: "This provision is, in effect, an automatic preliminary injunction. The statute substitutes an absolute rule in favor of the status quo for the court's discretionary consideration of the factors of irreparable harm and either a likelihood of success on the merits or a fair ground for litigation and a balance of hardships.... Under the statute, the inquiry focuses on identifying 'the then current educational placement,' and, further, on who should pay for it, for implicit in the maintenance of the status quo is the requirement that a school district continue to finance an educational placement made by the agency and consented to by the parent before the parent requested a due process hearing. To cut off public funds would amount to a unilateral change in placement, prohibited by the Act." *Id.* at 906.

The Third Circuit followed both of those cases in *Drinker*, 78 F.3d at 864–65. *Drinker* also held, in deciding whether the parents had effectively waived the protection of the stay put provision, that "[no] case that we have found interprets the stay put provision as suggesting that parents can lose their stay put protection except by affirmative agreement to give it up." *Id.* at 868.

In the recent Ninth Circuit case of *Johnson v. Special Education Hearing Office (SEHO)*, 287 F.3d 1176 (9th Cir.2002), the court acknowledged the previous decisions applying an automatic injunction, but decided that a different standard applied in that case because the district court was dealing with a motion to enjoin a preexisting "stay put" order.[12] The Ninth Circuit stopped short of officially endorsing the "automatic injunction" principle that operates when granting the "stay put," but an argument could be made that they would

---

**11.** 20 U.S.C. § 1415(e)(3) is the previous citation to the IDEA's "stay put" provision. The current citation is 20 U.S.C. § 1415(j).

**12.** The specific language from that opinion is as follows:

"Though Nicholas looks to our Sister Circuits for support, the cases he cites, given the procedural posture of this case, are inapplicable. Although the cases on which he relies contain strong 'automatic injunction' language, each deals with a district court's original grant or denial of a 'stay put' order or 'stay put' injunction. No case cited deals with appellate review of a district court's refusal to enjoin a preexisting 'stay put' order. *See Zvi D. v. Ambach*, 694 F.2d 904, 906 (2d Cir.1982) (stating that [§ 1415(j) ] 'substitutes an absolute rule in favor of the status quo for the court's discretionary consideration of the factors of irreparable harm and either a likelihood of success on the merits or a fair ground for litigation and a balance of hardships'); *see also Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 864 (3d Cir.1996) (quoting *Zvi D.* and adopting the reasoning of the Second Circuit); *Bd. of Educ. of Cmty. High Sch. Dist. No. 218, Cook County v. Illinois State Bd. of Educ.*, 103 F.3d 545, 550 (7th Cir.1996) (holding that use of the preliminary injunction equitable factors would 'dilute the statutory framework' under the 'stay put' provision)." *Johnson*, 287 F.3d at 1180.

have applied it if the district court was faced with that situation.

The District does cite one case that specifically permitted equity to be factored into the "stay put" analysis. In *Doe v. Brookline School Committee,* 722 F.2d 910 (1st Cir.1983), the court held that the IDEA gives district courts the power to grant equitable relief. "The power ultimately to award such relief ordinarily includes the power to issue preliminary relief in the appropriate exercise of discretion. Moreover, in the absence of a plain congressional intention to withdraw them, traditional powers of equity remain in the district court to enforce the Act." *Id.* at 917–18.

The *Brookline* court cited two Supreme Court cases, *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 313, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982), and *Porter v. Warner Holding Co.,* 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1946), for the principle that "the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. 'The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.'" *Brookline,* 722 F.2d at 917–18.

Nevertheless, this decision preceded the Supreme Court's decision in *Honig,* and seems to be in the minority in deciding whether equitable principles factor into the "stay put" analysis.

Accordingly, the Court holds that an equitable defense, in particular, the District's argument that Plaintiffs were intentionally deceptive in changing school districts, is irrelevant for the purposes of determining the "stay put."

### D. What criteria should the Court consider in determining the appropriate "stay put"?

The "stay put" provision, 20 U.S.C. § 1415(j) (Maintenance of current educational placement), provides the following:

> Except as provided in subsection (k)(7) of this section, during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the *then-current educational placement* of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.

20 U.S.C. § 1415(j) (emphasis added).

Thus, the central focus of the "stay put" is to determine the child's "then-current educational placement." Typically, the then-current educational placement is the placement described in the child's most recently implemented IEP. *See Johnson,* 287 F.3d at 1180 (citing *Thomas v. Cincinnati Bd. of Educ.,* 918 F.2d 618, 625 (6th Cir.1990)).

Therefore, absent anything more, Aja's "then-current educational placement" would be the Westmark school, since that was Aja's placement from the February 2001 IEP, which was the most recently implemented IEP.

### E. How does Cal.Educ.Code § 56325 effect the Court's determination?

However, there is something more. Plaintiffs are not simply objecting to a change in Aja's placement that was unilaterally implemented by the District, but instead Plaintiffs have independently chosen to change school districts, thereby invoking the requirements of Cal.Educ.Code

§ 56325(a). As noted previously, that section provides the following:

Whenever a pupil transfers into a school district from a school district not operating programs under the same local plan in which he or she was last enrolled in a special education program, the administrator of a local program under this part shall ensure that the pupil is immediately provided an interim placement for a period not to exceed 30 days. The interim placement must be *in conformity with* an individualized education program, unless the parent or guardian agrees otherwise. The individualized education program implemented during the interim placement may be either the pupil's existing individualized education program, implemented to the extent possible within existing resources, which may be implemented without complying with subdivision (a) of Section 56321, or a new individualized education program developed pursuant to Section 56321.

Cal.Educ.Code § 56325(a) (emphasis added).

Thus, the following questions arise: (1) Does the interim placement made "in conformity with an individualized education program" constitute the "then-current educational placement" for the purposes of the "stay put"? (2) If yes, does the District's unilateral placement of Aja in the Hart program constitute placement "in conformity with an individualized education program"?

*Johnson* goes a long way toward answering these questions. *Johnson* dealt with a student ("Nicholas") who, prior to reaching the age of three, was being educated pursuant to an IFSP at the Central Valley Regional Center, which contracted with the Central Valley Autism Project to provide the student with special therapy

and supervision.[13] After the child reached the age of three, his education became the responsibility of Clovis Unified School District ("Clovis"). Clovis and Nicholas' parents were unable to agree on an IEP for Nicholas. Nevertheless, before Nicholas turned three, Clovis proposed an interim educational placement utilizing the same goals and objectives as Nicholas' IFSP. However, Nicholas' parents were unsatisfied with the proposed interim placement, and Nicolas (through his parents) initiated a due process hearing with the Special Education Hearing Office ("Hearing Office"). Their goal was to maintain the status quo. Nicholas also filed a separate request for a "stay put" order with the Hearing Office. *Johnson,* 287 F.3d at 1178–79.

Since he had no IEP, Nicholas contended that the placement contained in his existing IFSP was his "stay put" placement, and, therefore, Clovis was required to provide the exact same program and vendors as the Regional Center provided under his IFSP. In response, the Hearing Office's "stay put" order did require Clovis to maintain Nicholas' educational placement and services pursuant to his IFSP, although it noted that Clovis "need not utilize the same vendors who provided services under that IFSP." Nicholas was not satisfied with this decision and filed a complaint in district court seeking a preliminary injunction of the Hearing Office's "stay put" order. *Id.* at 1179.

The Hearing Office analogized Clovis' responsibilities to Nicholas to a school district's responsibilities pursuant to section 56325. In commenting on the Hearing Office's analysis, the Ninth Circuit ruled as follows:

The Hearing Office reasoned that '[w]hen responsibility transfers from one

---

**13.** An IFSP (Individual Family Service Plan) is implemented instead of an IEP (Individual Education Program) for children under the age of three.

public education agency to another, the new public agency is required only to provide a program that is in conformity with the placement in the last agreed upon IEP or IFSP.' The new agency need not, and probably could not, provide the exact same educational program. The district court found this reasoning persuasive and thus, found no likelihood that Nicholas could successfully change his "stay put" order.

Nicholas contends he would be successful at trial in challenging the stay put order because the transfer code section used by analogy by the Hearing Office [section 56325] only applies to students moving long distances, students whose IEPs and IFSPs cannot be replicated. Therefore, Nicholas maintains, the district court's analogy to the transfer statute is inapposite because he did not move. We disagree. The analogy made by the Hearing Office and adopted by the district court has been used in previous special education hearing decisions to interpret the "stay put" provision's application to a three-year-old child's transition between educational agencies.... We, too, find it a useful comparison.

*Id.* at 1181. The Ninth Circuit went on to discuss the purpose of the "stay put" and how section 56325 attempts to implement those goals.

The purpose of the "stay put" provision is to strip schools of the "unilateral authority they had traditionally employed to exclude disabled students ... from school" and to protect children from any retaliatory action by the agency. *Honig v. Doe*, 484 U.S. 305, 323, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988); see also *Doe v. Brookline Sch. Comm.*, 722 F.2d 910, 918 n. 8 (1st Cir.1983). Similarly, the transfer provision minimizes the disturbance and turmoil in a student's education caused by a transfer.

Both statutes require placements that provide stability in education.

As the special education decisions acknowledge, when Nicholas turns three years old, responsibility for his education shifts from the Regional Center to Clovis, and the status quo necessarily changes. By requiring Clovis to provide an interim placement "in conformity with" Nicholas's IFSP, the Hearing Office maintained the stability of Nicholas's educational program as contemplated by the "stay put" provision, while taking into account the reality of a shift in responsible educational agencies.

Nicholas argues also that California's definition of placement supports his claim to future success in changing the "stay put" order. However, we note that California's definition of placement does not preclude the modification to Nicholas's educational vendors. In California "[s]pecific educational placement means that unique combination of facilities, personnel, location or equipment necessary to provide instructional services to an individual with exceptional needs." Cal.Admin.Code tit. 5, § 3042(a). The definition of educational placement is not an exact one, rather it is a combination of different factors listed in the disjunctive. Here, the Hearing Office's "stay put" order preserves the tutors, goals, and plan Nicholas used in his IFSP; it only changes the plan supervisors. As the district court pointed out, Clovis's personnel are highly qualified to supervise Nicholas's program. Thus the "stay put" order correctly determined Nicholas's "then current educational placement" and Nicholas has very little likelihood of success in challenging the "stay put" order. In addition, because Clovis offered comparable placement to Nicholas, no irreparable harm would befall

Nicholas by denying the preliminary injunction.

*Id.* at 1181–82.

Thus, in light of *Johnson*, the Court returns to the questions posed at the beginning of this section:

1. **Does the interim placement made "in conformity with an individualized education program" constitute the "then-current educational placement" for the purposes of the "stay put"?**

■ This is the quintessential question for this entire case, and, according to *Johnson*, the answer appears to be yes. The Ninth Circuit clearly recognized that there was a balance of goals in maintaining the stability of a child's educational program under the "stay put" provision while at the same time accounting for the reality of a shift in responsible educational agencies. *Id.* at 1182. The requirement that the new school district provide an interim placement "in conformity with" the exiting IEP was intended to achieve this balance. Thus, according to *Johnson*, the interim placement is the stay put placement.[14]

In fact, the SEHO came to an identical conclusion in its January 16, 2002 and March 11, 2002 Orders. The SEHO regarded the interim placement under section 56325(a) as the operative "stay put" for any dispute over the final recommendation made under 56325(b). In other words, according to the SEHO, Cal.Educ. Code § 56325 was intended to be the law in California governing "stay put" for stu-

dents transferring from one school district to another. *See* SEHO's March 11, 2002 Order, at 2–3.

Essentially, Plaintiffs' entire case is premised on the fact that the SEHO got it wrong. According to Plaintiffs, it would be nonsensical to equate the "then-current educational placement" with the "interim placement," because the whole point of the "then-current educational placement" is to create an undisputed location for a child to continue to receive educational services while the dispute regarding the propriety of the child's interim or permanent placement is being resolved. Since the District cannot deny that Aja was actually receiving her education at Westmark at the time that the due process hearing was filed, then that is the "then-current educational placement" for the purposes of the "stay put," end of story. The fact that the SEHO subsequently held that the interim placement was "in conformity with" the existing IEP is inconsequential. The purpose of the "stay put" is to maintain the status quo while such a decision is being made.

As Plaintiffs argue:

To hold that the stay put location depends on the outcome of the due process proceeding would be contrary to the express language of section 1415(j), to the decision of every court that has ruled on the issue, and to plain common sense. It is simply nonsensical to argue that the location of the stay put that should have been implemented at the

---

**14.** The *Johnson* court faced a situation where the SEHO, not the school district, had decided whether placement was "in conformity with" the existing IFSP. However, under section 56325(a), which the Ninth Circuit recognized as being a "useful comparison" to the circumstances in *Johnson*, the interim placement decision is almost always going to be made by the school district, not the SEHO. That notwithstanding, since the interim place-

ment is still required to be "in conformity with" the existing IEP, the *Johnson* holding still applies. Additionally, in *Johnson*, the SEHO did not appear to specify the exact placement for the "stay put." Instead, the SEHO merely required that the placement be in conformity with the IFSP, and set forth certain guidelines to that end, which essentially served the same function as section 56325(a).

outset of the dispute should be different based on who ultimately prevails in due process.

Plaintiffs' Reply Brief Re: Mootness, at 4.

Plaintiffs' argument is compelling, and the Court agrees that the case law generally seems to hold that a subsequent determination of proper placement would not effect the location of the "stay put." *See, e.g., K.T.,* 2001 WL 1715787 at *4. In fact, the Court agrees with Plaintiffs that the SEHO's determination that the District offered interim placement "in conformity with" Aja's existing IEP does not impact the result in this case.

However, with the exception of *Johnson,* no case cited by either party, or that the Court has been able to locate, has dealt with the application of Cal.Educ.Code § 56325(a) to 20 U.S.C. § 1415(j), or any law similar to section 56325 for that matter. It is this provision that compels the final result.

The fact remains, as the Ninth Circuit recognized, that there is a balancing involved when a child changes school districts. If Aja had moved from Glendale to, say, Sacramento, it would be inconceivable to require the new school district to pay for Aja's tuition, and, most likely, transportation to Westmark. Plaintiffs recognize as much in their brief, however, Plaintiffs couch the argument in different terms. Plaintiffs claim that, in such a situation, the child would have to withdraw from the private placement, and therefore there would be no operative placement actually functioning at the time. According to Plaintiffs, "[w]hen that occurs, a court may have no choice but to make an independent determination as to how the IEP should be implemented in order to preserve the child's placement as closely as possible to the educational placement specified in the last implemented IEP." Plaintiffs' Brief Re: Mootness, at 7.

Plaintiffs appear to miss the point. First, why would a child be forced to withdraw from private placement? What if the child maintained that the last placement was still the operative placement? And what if the move was not as drastic as Sacramento, but instead was to, for example, Riverside? Could a child then require that the new school district maintain the previous private placement, on which the new school district had absolutely no involvement in deciding, even if the new district had adequate resources to implement the child's education program within its own public school system? Plaintiffs would answer this question in the affirmative.

Second, the "determination as to how the IEP should be implemented in order to preserve the child's placement as closely as possible to the educational placement specified in the last implemented IEP" is precisely what section 56325 was intended to address by requiring interim placement "in conformity with" the IEP, which both the Ninth Circuit and the SEHO seem to recognize. However, in order to account for "the reality of a shift in responsible educational agencies," that decision is put in the hands of the new educational agency, not the courts, as Plaintiff suggests.[15] If that decision was subject to debate, then what is the purpose of the interim placement? According to section 56325(a), the interim placement lasts for 30 days, by which time a final determination of the child's placement must be made, pursuant to section 56325(b). Since it is only intended to last for 30 days, it is inconceivable that any dispute would be resolved within that time. Nevertheless, Plaintiffs

---

**15.** As noted in the SEHO's July 3rd Order, it is solely the school district's responsibility to offer immediate interim placement to a child that moves into that school district. *See* SEHO's July 3, 2002 Order, at 13.

argue that there must be a "stay put" placement for the period when the interim placement is being disputed. However, Plaintiffs fail to realize that there is no disputing the interim placement, because that would not make any sense. Certainly, the final placement determination is capable of being challenged, but while that decision is being made, the interim placement acts as the "stay put," because that has effectively become the "then-current educational placement" of the child.

The Court recognizes that this creates the potential for a result that may be at odds with the purpose of the "stay put" provision—the maintenance of the status quo during the pendency of any proceeding under the IDEA—because the school district is essentially given *unilateral* authority to determine the child's interim placement, which the IDEA attempts to avoid. *See Honig v. Doe,* 484 U.S. at 323, 108 S.Ct. at 604 ("We think it clear, however, that Congress very much meant to strip schools of the *unilateral* authority they had traditionally employed to exclude disabled students, particularly emotionally disturbed students, from school." (emphasis in original)); *see also Burlington,* 471 U.S. at 373, 105 S.Ct. at 2004 ("We think

at least one purpose of § 1415(e)(3) was to prevent school officials from removing a child from the regular public school classroom over the parents' objection pending completion of the review proceedings."). Nevertheless, a trade-off was necessary in the circumstance where a child chooses to move to a new school district, and this is the balance that the California legislature felt was justified and in accordance with the purpose of the IDEA, with which section 56325 was intended to comply.[16]

Furthermore, the Court does not find this result to be without justification. Unlike the situations contemplated in *Honig* and *Burlington,* where schools were unilaterally excluding disabled children from public classrooms, no such exclusion is occurring here.[17] Instead, Plaintiffs have made a conscious decision to remove Aja from the school district that was providing her "free appropriate public education," and relocate to a new school district. While that is certainly allowed, and the new school district is required to immediately provide Aja with placement in conformity with her existing placement, there is no requirement that the placement be identical.[18] Moreover, the new school district is left to its judgment *initially* as to

---

**16.** As noted in *Johnson,* the purpose of interim placement "in conformity with" an IEP is to "maintain[ ] the stability of [the student's] educational program as contemplated by the 'stay put' provision, while taking into account the reality of a shift in responsible educational agencies." *Id.,* 287 F.3d at 1182.

**17.** In fact, *Honig* recognized that the underlying purpose of the IDEA was to "mainstream" disabled students into public schooling. *See id.,* 484 U.S. at 311, 324, 108 S.Ct. at 597, 604. In the present case, we are dealing with a school district unilaterally attempting to place a child *within* the public school system, which is not at odds with the IDEA. As discussed in *Brookline,* "Obviously, the mainstreaming policy is frustrated if parents are able to defeat any effort to transfer their child into an adequate and appropriate

public school placement merely by appealing an adverse administrative decision.... Merely by filing an appeal parents can obtain the exact relief requested—maintenance of a publicly-funded private placement—and be insulated from reimbursement claims even though the public IEP is later ruled to be valid. We cannot believe Congress intended such an outcome, especially since it subverts the substantive core of the Act—the cooperative IEP process—and results in a private appropriation of public monies." *Brookline,* 722 F.2d at 916.

**18.** It is also worth noting that nothing in the law appears to have precluded Plaintiffs from contacting the Hart School District to determine an appropriate placement for Aja *before* enrolling Aja, in an attempt to avoid the problems associated with this dispute.

what is the appropriate placement. If Plaintiffs were entitled to challenge this decision and assert the previous placement as the "stay put," then this would require the new school district to fund Aja's placement in the exact same location—wherever in the State that may be—for as long as Plaintiffs chose to continue challenging the decisions of the District and the SEHO, which as the proceedings in this case have indicated, can take an extensive period of time. This is exactly the result that section 56325 was meant to avoid.

Additionally, section 1415(j) does not appear to sanction that result either. According to that subsection, when a child applies for initial admission to a public school, that child is to be placed initially in the public school program until all proceedings are completed. Accordingly, a child cannot initially enroll in a private school, then enroll in a public school and require the public school to fund the private school placement during the pendency of any proceedings. Thus, there appears to be no conflict between this requirement, and the requirement that a child changing school districts cannot require the new school district to fund a previous private placement, provided that the new school district provides placement in conformity with the existing IEP.

Finally, if Plaintiffs feel that the initial placement was not in conformity with the existing IEP, and that Aja was not provided with FAPE, then they are free to do exactly what they have done, which is to place Aja in a private school and seek reimbursements if the SEHO agrees that FAPE was not provided.

Therefore, the Court finds that the "then-current educational placement" (i.e. the "stay put" placement) in this instance is the interim placement offered by the District in accordance with Cal.Educ.Code § 56325(a).

**2. Did the District's unilateral placement of Aja in the Hart program constitute placement "in conformity with an individualized education program"?**

This question is not presently before this Court. The SEHO answered this precise question in its July 3rd decision, as noted above. Plaintiffs, who obviously disagree with the SEHO's analysis, are entitled to appeal that decision to a State court or district court under 20 U.S.C. § 1415(i)(2) in a separate proceeding. However, at the present time, the SEHO's decision regarding FAPE and interim placement stands. Therefore, there is nothing further this Court needs to decide in this case.

## V. CONCLUSION

Based on the above discussion, the Court finds that the "then-current educational placement" during the pendency of the due process hearing before the SEHO, pursuant to 20 U.S.C. § 1415(j), was the interim placement offered by the District, pursuant to Cal.Educ.Code § 56325(a). The Court denies all other relief sought by Plaintiffs in this action. Since there are no other issues pending before this Court, this matter is hereby closed.

IT IS SO ORDERED.